[Civ. Nos. 21248, 21906. First Dist., Div. One. Nov. 19, 1964.]

In re SYLVESTER COREY, a Person coming under the Juvenile Court Law. LORENZO S. BUCKLEY, as Chief County Probation Officer, etc., Plaintiff and Respondent, v. SYLVESTER COREY, Defendant and Appellant.

Garcia, Bruzzone & Dunn and G. M. Dunn for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—These are two consolidated appeals arising out of the same case and are taken by Sylvester Corey (hereinafter referred to as appellant), who was adjudged to be a ward of the juvenile court. The first appeal (No. 21248) is taken from a judgment of wardship under Welfare and Institutions Code section 602[1] and a commitment to the California Youth Authority;[2] the second (No. 21906) from an order denying a motion to set aside the judgment and commitment. The People (hereinafter referred to as respondent) contend that this second appeal should be dismissed on the ground that the order therein appealed from is not appealable. Before proceeding to discuss this question we set out the procedural background of these appeals.

A verified petition, filed on December 27, 1962, by the Proba-

---

[1]§ 602 provides: ''Any person under the age of 21 years who violates any law of this State or of the United States or any ordinance of any city or county of this State defining crime or who, after having been found by the juvenile court to be a person described by Section 601, fails to obey any lawful order of the juvenile court, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court.''

[2]An order declaring a minor the ward of the court is appealable. (Welf. & Inst. Code, § 800.)

tion Officer of Alameda County, alleged that appellant, age 17, was a person described in Welfare and Institutions Code section 602,[3] in that on November 10, 1962, he committed robbery while armed with a lug wrench. (Pen. Code, § 211a.) Following a hearing on the petition, the court found that appellant had committed the crime of robbery in violation of Penal Code section 211[4] and therefore declared him a ward of the court. Appellant filed a notice of appeal on January 30, 1963. Thereafter, on November 6, 1963, appellant filed a petition to set aside the judgment and commitment.[5] The petition alleged that one Leland Travers was responsible for the robbery which resulted in appellant being declared a ward of the court and his commitment to the Youth Authority. The court issued an order for a hearing pursuant to section 778.[6] The hearing was held on November 20 and 26, 1963. On the latter date, the court denied the motion to set aside the judgment and commitment. On November 27, 1963 the first appeal was scheduled for oral argument before this court. At oral argument counsel for appellant requested this court to consider new alibi testimony which had been adduced at the hearing to set aside the judgment of wardship. Since appellant had not as yet appealed from the denial of the motion to set aside the judgment we were unable to grant the request.

[3]Unless hereinafter otherwise indicated all statutory references are to the Welfare and Institutions Code.

[4]Apparently the petition was amended to read a violation of § 211 of the Pen. Code in lieu of § 211a, pursuant to a recommendation by the Probation Officer.

[5]The juvenile court has jurisdiction to hear and determine a motion to vacate an order adjudging a person to be a ward of the court even though an appeal is pending from such order. (See *Agnew* v. *Superior Court*, 118 Cal.App.2d 230, 233-234 [257 P.2d 661].)

[6]§ 778 provides as follows: "Any parent or other person having an interest in a child who is a ward or dependent child of the juvenile court or the child himself through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a ward or dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and, if made by a person other than the child, shall state the petitioner's relationship to or interest in the child and shall set forth in concise language any change of circumstance or new evidence which are alleged to require such change of order or termination of jurisdiction. If it appears that the best interests of the child may be promoted by the proposed change of order or termination of jurisdiction, the court shall order that a hearing be held and shall give prior notice, or cause prior notice to be given, to such persons and by such means as prescribed by Sections 776 and 779, and, in such instances as the means of giving notice is not prescribed by such sections, then by such means as the court prescribes."

However, the hearing on the first appeal was continued until such time as the second appeal could be heard. Appellant thereafter filed a notice of appeal from the order denying this motion on December 11, 1963. When the two appeals came on for oral argument, respondent, for the first time, raised the question whether the order denying the motion to set aside the judgment was an appealable order.

*Appealability of the Order Denying the Motion to Vacate*

It is the general rule that an order is not appealable unless declared to be so by the Constitution or by statute. (*People* v. *Keener,* 55 Cal.2d 714, 720 [12 Cal.Rptr. 859, 361 P.2d 587]; *People* v. *Valenti,* 49 Cal.2d 199, 204 et seq. [316 P.2d 633].) Section 800, which is part of the Juvenile Court Law, provides in pertinent part that "[a] judgment or decree of a juvenile court . . . assuming jurisdiction and declaring any person to be a person described in Section 600, 601, or 602, . . . may be appealed from in the same manner as any final judgment, *and any subsequent order may be appealed from as from an order after judgment;* . . ." (Italics added.) The pertinent language of section 800 which we are called upon to construe is that which we have italicized. Respondent contends that since juvenile court proceedings are civil in nature (§ 503) the italicized language has reference to the applicable provisions concerning appeals in civil cases. Accordingly, respondent urges that we must read section 800 in conjunction with Code of Civil Procedure section 963 which provides for appeals in civil cases. It is respondent's position that the italicized portion of section 800 has reference to the language in subdivision 2 of section 963 of the Code of Civil Procedure which provides that an appeal may be taken "from any special order made after final judgment. . . ." Since the judgment is not final in the present case, because it is before us on appeal, respondent argues that no appeal can be taken from the order denying the motion to vacate.

Respondent cites *In re Harrison,* 215 Cal.App.2d 723 [30 Cal.Rptr. 473]. This case is not in point because it involves the appealability of an order dismissing a petition to have a minor declared a ward of the juvenile court. Respondent also cites *People* v. *Olds,* 140 Cal.App.2d 156 [294 P.2d 1034], wherein it was held that since sexual psychopathy proceedings under the Welfare and Institutions Code are civil in nature the right to appeal is governed by section 963 of the Code of Civil Procedure, an appeal from a verdict must be dismissed because a verdict is not one of the orders specified in said

section from which an appeal may be taken. We are of the opinion that the *Olds* case is not applicable because the circumstances there are distinguishable from those in the present case. The Sexual Psychopathy Law (§§ 5500 et seq.) contains no specific provision for appeal and hence section 963 of the Code of Civil Procedure has been held to be applicable to it. (See *Gross* v. *Superior Court*, 42 Cal.2d 816, 820-821 [270 P.2d 1025].) ■ The Juvenile Court Law, on the other hand, contains a specific provision for appeals, namely section 800. Accordingly, under the rule that a special statute dealing expressly with a particular subject controls and takes priority over a general statute (*Brill* v. *County of Los Angeles,* 16 Cal.2d 726, 732 [108 P.2d 443] ; *Mitchell* v. *County Sanitation Dist.*, 164 Cal.App.2d 133, 141 [330 P.2d 411] ; *Estate of Compton,* 202 Cal.App.2d 94, 97 [20 Cal.Rptr. 589] ), section 800, and not code of Civil Procedure section 963, is the one which must be looked to with respect to appeals under the Juvenile Court Law. This conclusion was reached in *Moch* v. *Superior Court,* 39 Cal.App. 471 [179 P. 440], wherein the appellate court held that the right of appeal under the Juvenile Court Law is restricted to appeals from the judgments and orders enumerated in section 23 of that act. Section 23 of the Juvenile Court Law (Stats. 1915, ch. 631, p. 1248), is the original statute upon which section 800 is based and its language is substantially the same.[7] (See Legislative History, § 800.)

The crux of our inquiry, then, is the meaning and interpretation of the language of section 800 which reads as follows: ''[A]ny subsequent order . . . as from an order after judgment; . . .'' It should be noted that this language reads differently from that in Code of Civil Procedure section 963, subdivision 2, which provides that an appeal may be taken ''from any *special order made after final judgment.* . . .'' (Italics added.) The words we have underscored are not found in section 800. In the case of *In re Hartman,* 93 Cal.App.2d 801 [210 P.2d 53], an appeal was taken from the orders adjudging the minor to be a ward, committing him to the probation officer and placing him on probation. All three orders were held to be appealable. The last two mentioned were

---

[7] § 23 then read as follows: ''Every judgment or decree of a juvenile court assuming jurisdiction and declaring any person to be a ward of the juvenile court or a person free from the custody and control of his parents may be appealed from in the same manner as any final judgment, and any subsequent order may be appealed from as from an order after judgment.''

recognized to be appealable orders after judgment under section 580, which, in 1961, became section 800 without substantial change. ▮ We are satisfied that the crucial language in section 800 is contained in the words "subsequent order" and that it was the legislative intent to make appealable any order of a juvenile court after judgment which affects the substantial rights of the juvenile irrespective of whether the order declaring a person to be a ward of the juvenile court has become final. (See *In re DeBaca*, 197 Cal. App.2d 672, 674 [17 Cal.Rptr. 554].) ▮ In the present case, the second appeal arises out of proceedings brought pursuant to section 778 which authorizes a proceeding for the purpose of changing, modifying or setting aside a previous order of the court making a person a ward or dependent child of the juvenile court where there has been a change of circumstances or new evidence. The purpose of such hearing is to determine whether such circumstances or evidence makes some new or changed disposition desirable or necessary for the continued welfare of the child. ▮ Such a hearing and any order made pursuant thereto affect the substantial rights of the juvenile. There can be little doubt that an order made after a hearing pursuant to section 778 is a proceeding after the original judgment and commitment substantially affecting the rights of the minor and that it is an "subsequent order" under section 800. (See *In re DeBaca, supra,* p. 674; *In re Syson,* 184 Cal.App.2d 111, 114 [7 Cal.Rptr. 298].)

### The First Appeal

#### A. *The Sufficiency of the Evidence:*

Appellant contends that respondent has not met its burden of establishing its case by a preponderance of the evidence pursuant to section 701.[8] This contention is based upon the assertion that the evidence was insufficient to identify him as the perpetrator of the robbery and that the uncorroborated testimony of Van Jenks (hereinafter called Jenks) as to identity was mere opinion and therefore so inherently weak from an evidentiary standpoint as to leave it without convincing force. Opposed to this evidence, argues appellant, is the alibi evidence adduced by him which, when weighed against the evidence of identification, has so much more con-

---

[8] § 701 provides in part as follows: "[A] preponderance of evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by Section 602. . . ."

vincing force as to impel the conclusion, as a matter of law, that respondent has not proven its case by a preponderance of the evidence. In evaluating the merit of his contention, appellant urges that we consider the cumulative alibi testimony adduced both at the original commitment hearing and the subsequent hearing pursuant to section 778. No authorities are cited in support of this procedure. ■ As already discussed, the decree declaring appellant a ward of the juvenile court and committing him to the Youth Authority is a final judgment. Accordingly, we are bound by the well-established rule applicable to appellate procedure that in determining the correctness of a judgment or order appealed from an appellate court is limited to a consideration of the record thereof, and that error on the part of the trial court cannot be predicated by reason of any matter subsequent to its rendition. (*Olincy* v. *Merle Norman Cosmetics, Inc.* 200 Cal.App.2d 260, 275-276 [19 Cal.Rptr. 387]; *People's Home Sav. Bank* v. *Sadler,* 1 Cal.App. 189, 193 [81 P. 1029]; see *Bradley* v. *Bradley,* 40 Cal.App. 638, 640-641 [181 P. 237].) We cannot, therefore, consider the evidence adduced at the hearing which is the subject of the second appeal in our determination of the correctness of the order which is the subject of the first appeal. The propriety of the latter order must stand or fall upon the evidence before the trial court at the time of its rendition. Accordingly, if there is sufficient evidence set forth in the transcript of the proceedings at the first hearing to sustain the judgment, we must accept the judgment and findings of the lower court as conclusive. (See *In re Stein,* 86 Cal.App. 226, 230 [260 P. 566].)

■ By a "preponderance of evidence" is meant such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability of truth lies therein. (*People* v. *Miller,* 171 Cal. 649, 652-654 [154 P. 468]; *Lawrence* v. *Goodwill,* 44 Cal.App. 440, 451-452 [186 P. 781]; Witkin, California Evidence, § 59, p. 77; see BAJI Instruction No. 21 (Revised) 1964 Pocket Part.) ■ It is elementary that an appellate court cannot examine evidence to determine where the preponderance of the evidence lies. (*Bulkley* v. *Klein,* 206 Cal.App.2d 742, 751 [23 Cal.Rptr. 855]; *Estate of Harvey,* 143 Cal.App.2d 368, 370 [299 P.2d 712]; *Washko* v. *Stewart,* 20 Cal.App.2d 347, 348 [67 P.2d 144]; *Crain* v. *Security Title Ins. etc. Co.,* 6 Cal.App.2d 343, 345 [44 P.2d 632].) Our function is to determine whether the record contains any substantial evi-

dence tending to support the finding of the trial court. (*Bulkley* v. *Klein, supra,* p. 751; *Estate of Harvey, supra,* p. 370; *Phillips* v. *Standard Acc. Ins. Co.,* 180 Cal.App.2d 474, 480 [4 Cal.Rptr. 277]; *Washko* v. *Stewart, supra,* p. 348.) Consonant with this principle is the rule that when two or more inferences reasonably can be deduced from the evidence the reviewing court cannot substitute its own inferences for those of the trial court. (*Estate of Harvey, supra,* p. 370; *Washko* v. *Stewart, supra,* p. 349.) *Estate of Teed,* 112 Cal.App.2d 638 [247 P.2d 54], defines substantial evidence as follows: "[I]t clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (P. 644; in accord: *Forslund* v. *Forslund,* 225 Cal.App.2d 476, 499 [37 Cal.Rptr. 489]; *Dyer* v. *Knue,* 186 Cal.App.2d 348, 351 [8 Cal.Rptr. 753].) The principle of substantial evidence is applicable in juvenile court proceedings as in other matters. (*In re Corrigan,* 134 Cal.App.2d 751, 754 [286 P.2d 32].) Accordingly, the findings of the juvenile court judge will not be disturbed on appeal where there is substantial evidence to support them. (*In re Corrigan, supra,* p. 754; *In re Ayers,* 116 Cal.App.2d 55, 58 [253 P.2d 65]; *In re Schubert,* 153 Cal.App.2d 138, 143 [313 P.2d 968].)

Before proceeding to the questions of identity and alibi we set out the following evidence disclosed by the record. On November 10, 1962, shortly after midnight, two white male youths entered the taxicab of Jenks at MacArthur and Broadway in Oakland. Both passengers sat in the rear of the cab, gave the Grizzly Peak Ranch as their destination, and directed Jenks to proceed northeast on Broadway through the tunnel and to turn right immediately upon reaching the east end. Jenks drove east on the side road which parallels the tunnel until his passengers ordered him to stop at a point where this road intersects the Fish Ranch Road. Without warning he was struck on the back of his right shoulder at the base of his neck. Simultaneously, one of the youths moved from the rear to the front seat. Jenks did not know if he had first been struck with a weapon, but he testified that the youth in the front seat punched him several times. The youth in the rear of the cab reached over Jenks' shoulder and removed

a number of bills from his shirt pocket.[9] Jenks was then asked if he had any money of his own. The youth in the rear seat removed Jenks' wallet from his right rear pocket. Following the robbery, Jenks was ordered to drive north on Fish Ranch Road. At this time the youth in the rear brandished what the cab driver characterized as an " 'iron.' "[10] Jenks testified that he was unfamiliar with the area and stated that there was a heavy fog; therefore, he was unable to state exactly where he drove the youths during the better part of an hour following the robbery. From their directions, however, he gathered that they were searching for a particular road. They finally ordered him to stop the automobile, whereupon they left telling Jenks to wait 5 minutes. Jenks stated that to his knowledge he was never struck with a weapon. He estimated that nearly $15 in fares and tips was taken from his person. Between the time of the robbery and appellant's arrest, Jenks saw him on the street in downtown Oakland on several occasions. The first time was about 4 o'clock in the morning on an unknown date, but appellant quickly disappeared. The second time was during the day at a drugstore on Eleventh and Broadway Streets in Oakland, but the youth had disappeared by the time Jenks returned with the police. Jenks could not remember whether this second encounter was on a weekday or a weekend. At 3 p.m. on December 25, 1962, he again saw appellant loitering on the street in downtown Oakland. Jenks followed appellant for several minutes before the latter became annoyed and the two became involved in brief conversation. The police were notified and appellant was subsequently taken into custody. Later, fingerprints were lifted from the cab, but, when matched with appellant's, they proved to be dissimilar.

 Apropos the question of identity, to entitle a reviewing court to set aside a finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all. (*People* v. *Braun*, 14 Cal.2d 1, 5 [92 P.2d 402]; *People* v. *Jackson*, 183 Cal.App.2d 562, 567 [6 Cal.Rptr. 884].) The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if

[9]The narration of facts in both briefs was copied largely from the report of the probation officer to the court. The probation officer's report differs from the record as to this fact in that the report indicates that the youth in the front seat reached into Jenks' pocket and removed the money.

[10]The probation report states that the arrest report describes the object as a " 'lug wrench.' "

there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses and are for the observation and consideration of the trier of fact, whose determination will stand unless the testimony is inherently incredible. (*People* v. *Braun, supra,* p. 5; *People* v. *Jackson, supra,* pp. 567-568; *In re DeBaca, supra,* 197 Cal.App.2d 672, 677.) ▮ The testimony of a robbery victim, if believed by the trier of facts, is sufficient of itself to warrant a conviction, and no corroborative evidence is required. (*People* v. *Hornes,* 168 Cal.App.2d 314, 318-319 [335 P.2d 756]; *People* v. *Sanders,* 217 Cal.App.2d 606, 610 [31 Cal.Rptr. 707].) ▮ Nor is it a valid objection that the accused is identified by only one witness. (*People* v. *Whitson,* 25 Cal.2d 593, 604 [154 P.2d 867]; *People* v. *Wyback,* 193 Cal.App.2d 754, 757-758 [14 Cal.Rptr. 501]; *People* v. *Wiest,* 205 Cal.App.2d 43, 45 [22 Cal.Rptr. 846].) ▮ It is not essential that a witness be free from doubt as to one's identity. (*People* v. *Jackson, supra,* p. 568; *People* v. *Arenas,* 128 Cal.App.2d 594, 601 [275 P.2d 811]; *People* v. *Waller,* 14 Cal.2d 693, 700 [96 P.2d 344].) He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony. (*People* v. *Harris,* 87 Cal.App.2d 818, 824 [198 P.2d 60]; *People* v. *Abner,* 209 Cal.App.2d 484, 491 [25 Cal.Rptr. 882]; *People* v. *Tullous,* 119 Cal.App.2d 637, 639-640 [259 P.2d 955]; *People* v. *Cahan,* 141 Cal.App.2d 891, 897 [297 P.2d 715]; *People* v. *Deal,* 42 Cal.App.2d 33, 37 [108 P.2d 103]; *People* v. *Glab,* 15 Cal.App.2d 120, 123 [59 P.2d 195]; see also: Witkin, California Evidence, § 171, p. 192.) ▮ Our courts have also held that it is not necessary that any of the witnesses called to identify the accused should have seen his face. (*People* v. *Loar,* 165 Cal.App.2d 765, 773 [333 P.2d 49].) Identification may be based on other peculiarities such as size, appearance, similarity of voice, features or clothing. (*People* v. *Molarius,* 213 Cal.App.2d 10, 15 [28 Cal. Rptr. 541]; *People* v. *Van De Wouwer,* 91 Cal.App.2d 633, 639 [205 P.2d 693]; *People* v. *James,* 218 Cal.App.2d 166, 170 [32 Cal.Rptr. 283]; see *People* v. *Glab, supra,* p. 123; and *People* v. *Coley,* 61 Cal.App.2d 810, 813-814 [143 P.2d 755].) ▮ Adverting to the record in the light of these principles, we are satisfied that the evidence of identity was of

sufficient substantiality. Jenks testified that he paid particular attention to appellant when he picked up the two fares. He specifically identified appellant as the passenger who was sitting in the back seat, stating that he paid particular attention to him because he appeared to be "a little drunk. . . ." He remembered appellant's hair as being "blondish-brown" in color. In response to the question, "[h]ow do you recognize the boy?" he answered, "[w]ell, I would recognize a man several ways—the features of his face, silhouette. You can recognize a man by a silhouette." The answer to a further question, "[h]ow do you specifically recognize Sylvester?" was: "Well, Sylvester's voice is very distinctive to me. I listened to him for quite awhile, and his receding hairline. He walked from the corner to get in the cab." Furthermore, Jenks, after watching appellant during the course of the hearing, stated to the court that, "[t]here is something I have noted Sylvester doing here in the courtroom that I remember very distinctly." The court replied, "[w]hat is that?" Jenks stated: "The man sniffs; always sniffing his nose and wiggling his upper lip. . . . I have watched him do it twenty-five or thirty times, always sniffing his nose. That probably don't [sic] mean anything, but I remember that when I was driving." He also identified appellant as the boy who struck him from behind and remained in the back seat of the cab.

Turning to the alibi testimony, the record discloses the following: Testifying on his own behalf, appellant denied entering the cab at MacArthur and Broadway on the evening of November 10, shortly after midnight. He asserted that at the time in question he was on a bus enroute to San Francisco for the purpose of visiting one Alfred Kober. Appellant stated that he took the 11:03 p.m. bus departing from the Doggie Diner in Oakland and arrived in San Francisco about midnight; that upon leaving the depot, he proceeded directly to Kober's house.[11] Kober testified that appellant, whom he only knew by the name " 'Corky,' " was in his apartment just after midnight on November 10, 1962. He stated that initially he was not positive which weekend in November appel-

---

[11]Counsel for appellant directs our attention to a probation officer's memorandum which is part of the clerk's transcript. This memorandum indicates that a check of the Alameda Naval Air Station roster was made and that it shows appellant was on duty each weekend in November, excepting the weekend of November 9 and 10. The record is silent as to whether this memorandum was read to or seen by the trial judge.

lant had visited him, but that on the evening before his appearance in court he had ascertained from one Jean Saville that it was on November 10. Kober also testified that Saville told him he had stopped by after getting off work at 2 a.m. on this date, and remembered seeing appellant in Kober's apartment. Kober also testified that another person named Tom Bertram was in the apartment that night.[12]

Whether a defendant sufficiently establishes an alibi is a factual question for the trier of fact. (*People* v. *Mercer*, 103 Cal.App.2d 782, 790 [230 P.2d 4].) It devolves upon him to prove the alibi to such a degree of certainty as will, upon a consideration of all the evidence, leave a reasonable doubt of his guilt in the mind of the trier of fact. (*People* v. *Lewis*, 81 Cal.App.2d 119, 124 [183 P.2d 271]; *People* v. *Alexander*, 78 Cal.App.2d 954, 958 [178 P.2d 813].) The weight to be given alibi testimony is for the jury (*People* v. *Weathers*, 97 Cal.App.2d 821, 823 [218 P.2d 545]), or, in a nonjury case, for the trial court. (*People* v. *D'Elia*, 73 Cal.App.2d 764, 767 [167 P.2d 253].) The presence of alibi testimony does not make the positive identification of a defendant produced by the prosecution unbelievable per se. (*People* v. *King*, 103 Cal.App.2d 122, 126-127 [229 P.2d 20]; *People* v. *Ohman*, 67 Cal.App.2d 467, 475 [154 P.2d 463].) Where there is a conflict of evidence on the question of alibi, the findings of the trier of fact thereon are binding on appeal. (*People* v. *Spillard*, 15 Cal.App.2d 649, 652-653 [59 P.2d 887]; *People* v. *Mercer*, *supra*, p. 791; *People* v. *Villarico*, 140 Cal.App.2d 233, 238 [295 P.2d 76].)

Turning once again to appellant's argument with respect to the preponderance of the evidence in the light of the record and the foregoing principles, we find that it is, in reality, an attack upon the trial court's power to judge the credibility of the witnesses. The fallacy of appellant's argument is the assumption that a greater quantum of evidence on one side is as credible as a lesser quantum of evidence on the other side, and that, therefore, the lesser amount of evidence cannot constitute a preponderance of the evidence. As we have already noted, the determination of credibility

---

[12] A court officer, one Holliman, thereafter made a statement to the court, which was not objected to, that he had contacted Bertram, who could not come to court because he was ill, and that Bertram told him that he did not recall the nickname "Corky" and denied being in Kober's apartment on the evening of the 9th or early morning of the 10th of November.

is the exclusive function of the trier of fact. We have also pointed out that the evidence as to appellant's identification as a perpetrator of the robbery is of sufficient substantiality. The alibi evidence, at best, caused a conflict only with the testimony of Jenks who positively identified appellant as one of the robbers and the resolution of the conflict by the trial court against appellant cannot be disturbed on appeal.

### B. *The Waiver of Counsel:*

Appellant contends that his waiver of counsel was not intelligently made because the trial judge failed to comply with the procedure set forth in section 700, which, in pertinent part, provided as follows: "At the beginning of the hearing on a petition filed pursuant to Article 7 (commencing with Section 650), the judge or clerk shall first read the petition to those present and upon request of the minor . . . or upon the request of any parent, relative or guardian, the judge shall explain any term of allegation contained therein and the nature of the hearing, its procedures, and possible consequences. The judge shall ascertain whether the minor or his parent or guardian has been informed of the right of the minor to be represented by counsel, and if not, the judge shall advise the minor and the parent or guardian, if present, of the right to have counsel present." The record discloses that when the matter came on for hearing, and prior to the reading of the allegations of the petition by the clerk, the trial judge asked appellant whether he desired an attorney, that appellant replied that he wished to go ahead without an attorney, and that he refused to employ an attorney even though he had been advised of his right to counsel.[13] Thereafter, the petition was read and the hearing commenced. Appellant does not contend that he was not informed of his right to counsel, nor does he deny that he expressly waived that right. He maintains, however, that since he was advised of his right to counsel *prior* to the reading of the petition his waiver was not an intelligent one because he was not then aware of the "nature of the hearing, its procedures, and possible consequences" within the contemplation of section 700.

Appellant's argument is, in our opinion, answered by the holding of *In re Patterson,* 58 Cal.2d 848 [27 Cal.Rptr. 10, 377 P.2d 74]. There the trial judge proceeded with the

---

[13]The record also discloses the following colloquy: "THE COURT: You have talked with the Public Defender and he is unable to represent you? SYLVESTER COREY: Yes, sir."

hearing without informing the minor and his mother, who was present, of the right to counsel. However, the records before the court at the commencement of the hearing reflected that the minor had been advised at the detention hearing before a referee of the juvenile court of the right to counsel and that his mother, who was present at the hearing on the petition, had been advised of the right to counsel in the notice of hearing personally served upon her.[14] The Supreme Court held that once the judge had ascertained from the records then before him that the minor and his parent had been informed of the right to counsel and that no request had been made for the appointment of counsel, he was justified in proceeding without again advising the minor or his parent of the right to counsel. "That duty," said the court, "would have evolved upon him only if it had appeared that they had not previously been advised of such right." (P. 852.)

C. *The Juvenile Court's Role of "Parens Patriae"*:

▮ Appellant contends that the juvenile court failed to fulfill its role as counsel for the defense when it did not test the qualifications of the identifying witness and when it did not obtain the testimony of Bertram and one Jean Saville,[15] both of whom were alleged to have been able to provide appellant with an alibi. With respect to the first observation, the record discloses that the court examined Jenks closely as to the accuracy of his identification and the specifics of the robbery. As respects Bertram, it appears that the court did attempt to obtain his presence but was unable to do so

---

[14]In the case at bench the detention order of December 27, 1962, recites that appellant was informed of his right "to be represented at every stage of the proceedings by Counsel. . . ." Moreover, the memorandum of the deputy probation officer to the court dated January 14, 1963, discloses that appellant was not only informed of his right, but was given every opportunity to obtain an attorney. The memorandum is as follows: "Sylvester was informed by the Probation Officer of his right to be represented at the hearing by an attorney. When this fact was initially disclosed to him the boy indicated that he wished to be represented. The Public Defender's Office was contacted by the Probation Officer and the boy [was] subsequently interviewed by an attorney from that department. The office then notified the Probation Officer that Sylvester was ineligible for such representation. Reportedly there is a trust fund in his name from which he may draw funds to pay for an attorney. The boy was informed of this fact by the Probation Officer and again asked if he wished this Department to contact the Bar Association. At that time the boy stated that he did not wish a lawyer. A few days later he was again asked if he wished to be represented and at that time he stated in vague terms that it was too late."

[15]The name of Jean Saville was injected into the record by Kober as another person who had reminded him that appellant was at Kober's house on the early morning of November 10th.

because of illness. Moreover, it also appears that Bertram stated he did not know appellant and that he was not in Kober's house on the night in question. No request was made that Saville be subpoenaed, nor was any suggestion made by appellant that Saville was an alibi witness. This suggestion was made by Kober as the basis for his own refreshment of memory. Appellant's argument assumes that the judge of the juvenile court has the duty of aggressively acting as an advocate on behalf of the minor. Such a role is inconsistent with the judicial function. The trial court's role as *parens patriae* is fulfilled if at all stages in the proceedings it assures the minor of his statutory rights and follows the statutory procedures in conducting the hearing. Having carried out this obligation in the case at bench, we cannot say that the court below abused its discretion.

## The Second Appeal

The second appeal, unlike the first, is not confined solely to transcripts of the proceedings from which it emanates. Although we have found no case directly construing section 778, and none has been cited to us,[16] we are satisfied that in passing upon the matters presented pursuant to a petition under said section the trial court must necessarily consider the matters which formed the basis of the order previously made in order to ascertain whether there has been a "change of circumstance" or "new evidence" warranting a change, modification or setting aside of such previous order. We believe that in principle and in its application, section 778 is akin to Civil Code section 139 with respect to the modification and termination of alimony and child support payments because of changed circumstances. In such proceedings the circumstances existing when the order sought to be modified or terminated was made are considered in order to determine whether there has been a substantial change in the circumstances warranting a modification or termination. (See *Marxer* v. *Marxer,* 185 Cal.App.2d 400, 403 [8 Cal. Rptr. 323]; *Crain* v. *Crain,* 187 Cal.App.2d 825, 831 [9 Cal.Rptr. 850]; *Bratnober* v. *Bratnober,* 48 Cal.2d 259, 261 [309 P.2d 441].) In these cases it is well established that the modification or termination rests in the sound discretion of the trial court and, in the absence of a clear showing of abuse of discretion, an appellate court is not free to interfere

---

[16]§ 778 was added in 1961 and is based on former § 753 as added in 1959.

with the trial court's order. (*Crain* v. *Crain, supra,* p. 834; *Bratnober* v. *Bratnober, supra,* p. 262.)

We are persuaded moreover that section 778 must be read in conjunction with section 775 which provides that "[a]ny order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article." The cases recognize that once having attained wardship the juvenile court retains exclusive jurisdiction but that this jurisdiction is on a temporary basis subject to the duty to dismiss such wardship proceedings when the court becomes convinced on evidence properly before it that the protection of the child no longer requires wardship. (*People* v. *De Fehr,* 81 Cal.App. 562, 574 [254 P. 588]; *In re Stein, supra,* 86 Cal.App. 226, 230; *In re Contreras,* 109 Cal.App.2d 787, 792 [241 P.2d 631]; *In re Syson, supra,* 184 Cal.App.2d 111, 117.) *De Fehr* and *Stein* were concerned with sections of the Juvenile Court Law which are the predecessors of section 775. The opinions in *Contreras* and *Syson,* although recognizing the continuing jurisdiction of the juvenile court, make no reference to either section 775 or 778. In *Stein* the reviewing court noted that, although it was required to accept the findings of the lower court adjudging a minor to be a ward of the court, because the evidence was sufficient, the procedure providing for an application for a modification or setting aside of the orders of the juvenile court gave such court, if it made an error in its estimate of the testimony upon which it acted in making the previous order, an opportunity to correct it at any time. The cases also establish the principle that the modification or termination of an order previously made by a juvenile court rests within its discretion, and that its order granting or refusing an application for modification or termination may not be disturbed unless there has been an abuse of discretion. (*People* v. *De Fehr, supra,* p. 574; *In re Contreras, supra,* p. 792.)

The basis of the motion to set aside the previous order of the court was the "new evidence" that one Leland Travers had admitted he was the perpetrator of the robbery in question. At the hearing, however, in addition to the testimony of Travers and one J. M. Short in this regard, appellant also called the aforementioned Saville as an alibi witness and recalled Jenks as a witness.[17]

---

[17]Appellant was represented by counsel at this hearing.

Short, a Correctional Counselor at the Deuel Vocational Institution, testified concerning a conversation at which he was present along with appellant, his attorney and one Travers, an inmate at said institution. According to Short, during this conversation, which was about the robbery in question, Travers said " 'Yes, I did it.' " On cross-examination, Short testified that two days after this conversation Travers, in the presence of his counsellor and Short, denied that he committed the robbery, and stated that he and appellant had had a conversation wherein the latter stated: " 'Why should both of us ride this beef?' " Short also stated that Travers told him he thought he " 'could ride his beef if it didn't mess up my time' " and that "he had been fully informed of what had happened but that he had not been in on it."

Travers testified that he and a friend named "Tommy" entered a green and white "Lux" taxicab at Broadway and MacArthur Boulevard in Oakland on November 10, 1962, and directed the driver to take them to the Grizzly Bear Ranch; that he rode in the back seat and his companion in the front seat with the cab driver; that they went "up toward Skyline Boulevard";[18] that his companion struck the driver in the back of the head when he refused to drive up a certain road; that after driving up the road he told the driver to stop; that the driver handed his companion his wallet; that his companion took the money out and returned the wallet to the driver; and that he told the driver not to start the motor and to " 'stay right there until we make it.' " Travers also testified that appellant had been present during the planning of this robbery but that he "didn't want to go. He said he was going to Frisco so he took off. He was with some other guy, Danny." When asked at the hearing if Jenks was the taxicab driver, Travers said "[h]e looks just like him"; but also said "he looks different."

Jean Saville testified that he lived with Kober from September to the latter part of November in 1962 and that a little over a week after the 30th or 31st of October on either a Friday or Saturday night at about 2:30 a.m. he saw appellant at Kober's house. Jenks was examined at length, but again identified appellant as one of the robbers and stated that Travers was not one of them.

What we have already said as to identity, alibi, credibility

[18]The reference is apparently to Fish Ranch Road.

and substantiality of the evidence with respect to the first appeal is likewise applicable here. The trial court was the sole arbiter as to the credibility of the witnesses. Saville's alibi testimony was not positive but vague as to the exact time appellant was at Kober's home. In view of Short's testimony, the trial court was entitled to disregard that of Travers. Moreover, in view of Jenks' positive identification, which he again repeated at the subsequent hearing, we have, at best, a conflict in the testimony. Accordingly, we cannot disturb the trial court's resolution of that conflict. Nor can we say that under all the circumstances the trial court abused its discretion in denying the motion to vacate.

The judgments appealed from are affirmed.

Sullivan, P. J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.