Filed 11/21/22 P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094159 |
| Plaintiff and Respondent, | (Super. Ct. No. 93F07155) |
| v. | |
| ALONZO JOHNSON, | |
| Defendant and Appellant. | |

In 1993, defendant Alonzo Johnson drove away from William Land Park in his white sports utility vehicle (SUV) with codefendant, Darrick Jacques Dobynes. A jury found defendant guilty of murder when Dobynes shot the victim from the SUV on Freeport Boulevard. Defendant appeals the trial court's denial of his petition for resentencing under Penal Code former section 1170.95 (statutory section citations that follow are found in the Penal Code unless otherwise stated) because the prosecutor failed to prove beyond a reasonable doubt defendant and his codefendant were not acting in self-defense or as a result of a sudden quarrel. We affirm the trial court's order.

1

## FACTS AND HISTORY OF THE PROCEEDINGS

By amended information, the prosecution charged defendant and Dobynes with first degree murder (§ 187, subd. (a); count 1), and alleged three enhancements to this count: this was a serious felony, Dobynes used a firearm, and defendant was a principal in the crime and one or more of the principals were armed with a firearm (§§ 1192.7, subd. (c)(7), 12022.5, subd. (a), 12022, subd. (a)). The information also charged defendants with willful discharge of a firearm from a vehicle (§ 246; counts 2 & 3) and alleged counts 2 and 3 were serious felonies (§ 1192.7, subd. (c)(8)). The information further alleged defendant allowed Dobynes to discharge a firearm from his vehicle. (§ 12034, subd. (b); counts 4, 5 & 6.) Finally, the information alleged defendants committed counts 1 through 3 for the benefit of a street gang. (§ 186.22, subd. (b)(1).)

One Sunday in June 1993, defendant, Dobynes, and their friends went to William Land Park (Land Park) in defendant's SUV. Defendant drove and Dobynes was in the front passenger seat. A month prior to this trip, defendant's SUV was hit by bullets while it was parked in Oak Park in an apparent warning for defendant to stay out of Oak Park Blood territory.

Dobynes was a member of the Meadowview Bloods street gang. Defendant was a member of the Del Paso Heights Manor Mob Gangsters, a faction of the Del Paso Heights Bloods. At the time, the Oak Park Bloods considered Land Park part of their territory. Further, at the time, there was an ongoing feud between the Meadowview Bloods, the Del Paso Heights Bloods, and the Oak Park Bloods.

Before they went to Land Park, defendant and his friends stopped at a home where Dobynes armed himself with a .50-caliber handgun. When he returned to the SUV, Dobynes put the weapon under his seat.

The victim and his cousin S.K. also went to Land Park that day. They were members of the Oak Park Bloods.

When defendant and his friends arrived at Land Park, they spoke with various women and some rap music artists.

Later that evening, a fight broke out between two women. One of defendant's friends, A.A. noticed a large group of the Oak Park Bloods starting to come together. Defendant, Dobynes, and the other men decided it was time to leave and got into defendant's SUV. Shots were fired at the SUV as they drove out of Land Park. Defendant drove through two cars that attempted to blockade him. Dobynes fired his gun out of the car window into the air once or twice.

Defendant turned south onto Freeport Boulevard. He drove approximately a mile and a half before he encountered the victim and S.K. in a blue Oldsmobile Cutlass at Freeport Boulevard and Wentworth Avenue. At this location, the parties agree the evidence shows Dobynes fired two shots from the SUV at the blue Cutlass killing the driver.

Although defendant did not testify at trial, his videotaped statements to police officers were played for the jury. In the first statement, defendant said he did not have the SUV with him when he was at Land Park. He claimed he went to Land Park with a friend named S.R. and they left Land Park via Sutterville Road to I-5 after the shooting started.

In the second interview with police, defendant admitted he drove his friends to Land Park in the SUV and he knew Dobynes had a gun with him. After the shooting at Land Park, but before the fatal confrontation at Freeport Boulevard and Wentworth Avenue, defendant claimed to have stopped at the Kentucky Fried Chicken parking lot on Freeport to see if he had any bullet holes in his car. When he saw none, he drove back onto Freeport. It was then that the blue Cutlass drove up on them and the shooting that killed the victim occurred. Defendant also admitted to having prior problems with the Oak Park Bloods when they shot his car. Defendant did not tell the officers he heard or saw anyone shooting at him while he was driving down Freeport Boulevard.

3

An independent witness, E.R., testified she was in the bank parking lot adjacent to the shooting when it happened. She testified at trial she heard a loud boom and then looked up and saw the blue Cutlass come up into the left-hand turn lane and stop. In her testimony at the preliminary hearing and when she originally spoke to police officers, however, she said the first sound she heard was the tires screeching. Next, E.R. saw defendant's SUV come up quickly next to the blue Cutlass and stop. She saw a person in the SUV fire at the blue Cutlass from the SUV's driver's side window. The SUV then turned right onto Wentworth and drove away.

The prosecution also presented the testimony of A.A., who was one of the passengers in defendant's SUV. His statement to the police and his testimony at trial were contradictory.

In his original statement to the police, he did not tell the police the occupants of the blue Cutlass were shooting at defendant's white SUV and he affirmatively said he did not see anyone shooting any guns on Freeport Boulevard. A.A. reported when the victim's blue Cutlass caught up to them, defendant stared at the blue Cutlass for a minute, and then said, "There they go, there they go." Defendant sped up and got right next to the blue Cutlass and Dobynes shot at it twice through the driver's side window.

At trial, A.A. testified that while they were traveling down Freeport Boulevard, A.A. saw Dobynes with a gun in his lap. His testimony about whether they were shot at and where the shots came from was inconsistent. First he said, the occupants of the blue Cutlass were following the SUV, shooting at them while they were traveling on Freeport Boulevard. Next, however, he testified shots were being fired at them but not from the blue Cutlass. Ultimately, A.A. testified he never saw anyone firing weapons on Freeport Boulevard.

A.A. testified he saw the blue Cutlass pass them and get in the left-turn lane as if it was going to make a U-turn. At that time, Dobynes said, "There go them fools that shot at us right there." A.A. testified the defendant sped up his car to catch up to the blue

4

Cutlass and defendant said, "That's the fool that was shooting." A.A. testified he heard shots and then saw defendant duck down as Dobynes fired at the blue Cutlass. Later, he clarified that he did not see shots coming from the blue Cutlass, but there were gunshots hitting their car.

A second witness in the defendant's SUV, J.D., Dobynes' cousin, testified at trial he heard gunshots as the car went down Freeport Boulevard about a block or two from the park. Shortly thereafter, he heard two more gunshots coming from right next to or inside the car. J.D. denied telling a detective on the day of the shooting that he observed a blue Cutlass following him, but admitted he did tell officers he did not see anyone in that car fire a weapon. He also testified he told the detective, the only time he heard any unusual noise was when the car first turned on to Freeport Boulevard from Land Park.

Another witness in the SUV, A.Q., testified he did not hear any gunshots after Dobynes fired his gun out of the car while leaving Land Park. As they drove down Freeport Boulevard, he noticed two cars behind the SUV. The blue Cutlass pulled up beside them at the light where they were stopped. He heard a loud noise that sounded like a backfire or gunshot from behind the SUV. He ducked down and heard a shot from inside the SUV. When he looked up, the SUV was pulling off Freeport Boulevard. He could not identify who fired the weapon from the SUV and did not see any of the occupants of the SUV with a gun.

A.Q. testified a second blue Cutlass followed them when they made a turn from the intersection of the shooting for about five minutes. Defendant pulled the car to the side of the road and the second blue Cutlass passed them, made a U-turn and passed them again, and made a second U-turn and as it was coming up; Dobynes fired a shot at the Cutlass.

The prosecution also presented the jury with the preliminary hearing testimony from S.K., the passenger in the victim's car. S.K. testified he saw defendant's white SUV leave Land Park and a couple guys running after the SUV shooting at it. S.K. and

5

the victim got into their blue Cutlass and drove out of Land Park and turned south onto Freeport Boulevard intending to go to the victim's home in Oak Park. Because there were too many cars trying to turn left on to Sutterville Road, they drove past that street and got into the left-hand turn lane to make a U-turn to go back. S.K. had no idea how he and the victim caught up to and passed the SUV. While they were stopped at a light waiting to make a U-turn, the SUV pulled up beside them and started shooting at them. The victim said, "I'm hit," and slumped over.

A gang expert testified that gang members would retaliate for perceived acts of disrespect by shooting at rival gang members or hurting members of their family. The expert also opined that if a person were to go into another gang's territory armed with a weapon, they were attempting to protect themselves, to commit criminal activity or to retaliate.

S.K. testified he threatened defendant when he confronted him in jail for his part in the actions to let him know someone from the Oak Park Bloods would take revenge on him.

As noted by A.Q.'s testimony, shortly after shooting the victim, defendant and his friends happened upon another blue Cutlass driven by L.S., a former rival gang member. L.S. testified he followed the SUV in this car for 10 or 15 minutes and then the SUV pulled to the side of the road. As L.S. drove by, Dobynes shot at him.

The jury convicted defendant of second degree murder (§ 187, subd. (a)), two counts of shooting at an occupied vehicle (§ 246), and three counts of permitting another to shoot from a vehicle (§ 12034, subd. (b)). The jury also found true a principal was armed with a firearm (§ 12022, subd. (a)) and the murder and shooting at a vehicle offenses were gang related (§ 186.22, subd. (b)).

The trial court sentenced defendant to 15 years to life on the murder charges plus a determinative term of eight years four months.

6

In 2020, defendant filed a petition under Senate Bill No. 1437 (2017-2018 Reg. Sess.) to have his murder conviction vacated and to be resentenced. Senate Bill No. 1437 created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended. This provision was originally codified as section 1170.95. In the wake of the Supreme Court's decision in *People v. Lewis* (2021) 11 Cal.5th 952, the Legislature amended section 1170.95 to adopt certain of *Lewis*'s holdings. (Stats. 2021, ch. 551, § 1, subd. (b).) The Legislature later renumbered the provision section 1172.6 without substantive change, effective June 30, 2022. (Stats. 2022, ch. 58, § 10.) Unless otherwise noted, citations in this opinion are to former section 1170.95, the section in place when the petition was filed and denied by the trial court. Defendant attached a declaration from Dobynes stating that defendant did not know Dobynes was going to shoot the victim, nor did defendant help or encourage him. Dobynes averred he and defendant "were only on [the street] for a couple of minutes, driving quickly, and in fear, fleeing the park." Defendant submitted a brief where he affirmed under penalty of perjury he did not know he was being chased after he left Land Park until Dobynes fired at the vehicle that pulled up alongside his SUV.

The trial court issued an order to show cause (OSC) for the prosecution to demonstrate why defendant should not be granted relief pursuant to former section 1170.95, subdivision (c). At the OSC hearing, the prosecution presented the clerk's and reporter's transcripts for the underlying trial, the preliminary hearing testimony of S.K. read to the jury (summarized above), and the transcripts of the police interview statements of defendant and A.A. that were provided to the jury.

Although they did not testify at trial, defendant and Dobynes testified in support of the petition. Dobynes testified he heard gunshots when he was getting into the car to leave Land Park and heard bullets strike the SUV. Dobynes claimed he was scared so he shot his gun twice in the air to try to get people to stop shooting at him. He heard more gunshots and bullets hitting the SUV as they drove away. Dobynes testified he believed

7

they were being followed by a blue Cutlass and another car as they drove down Freeport Boulevard. Dobynes claimed he was in fear for his life. Dobynes testified the SUV got caught at a red light and had to stop. When the blue Cutlass pulled up on the left side, Dobynes heard a couple of shots, so he reached out of the back driver's side window of the SUV and shot at the blue Cutlass two times.

Dobynes admitted he told the parole board he was angry when he committed this crime. He also told them he had a fear of being rejected and losing respect in the gang culture he was involved in at the time. When asked if he remembered telling the commissioner, "In the moment, I feel disrespected, you know? I said, I'm gonna kill these guys. I'm gonna make them pay[,]" Dobynes replied, "I don't quite remember that dialogue, but I do remember saying that I feel disrespected, yes." He also told the parole board, he made a conscious decision to kill.

Defendant testified he heard shots when he got into the SUV at Land Park. He looked in his rear-view mirror and saw someone with a gun. While they were on Freeport Boulevard, someone in the SUV said, "Man, here they go. They coming right now." Defendant testified he was still hearing shots, saw cars chasing him, and feared for his life. When he stopped at the light, the blue Cutlass pulled up on the side of the SUV. Just before he started to drive forward, he heard gunshots and then Dobynes fired the shot that killed the victim. He testified three to five minutes passed between the time he left Land Park and the time of the shooting. On cross-examination, defendant admitted he knew Dobynes was armed in his SUV and he lied to officers about this at the time he was interviewed.

The trial court considered the petition and the evidence submitted by the parties. In its ruling, the trial court liberally cited our prior appellate opinion for the basic facts of the events of the evening, but also focused on the underlying evidence submitted at the original trial and the additional evidence submitted in support of the petition on the key disputed point—did the defendant and Dobynes believe they were being chased by the

8

victim or had they escaped harm and killed in retaliation. The trial court reviewed the relevant legal standards and found the prosecution met its burden of proving beyond a reasonable doubt defendant could be convicted of murder under the new law.

The court's findings rested on four key points. First, the trial court rejected the self-serving and controverted testimony of Dobynes and defendant that they were being chased and fired upon and found the testimony of A.A., who was in the SUV, and E.R., an independent witness, more credible. These witnesses established defendant was the one who accelerated to catch up to the blue Cutlass to allow Dobynes to shoot and kill the victim.

Second, the court found that while defendant and Dobynes might have been in fear for their lives at the time they left Land Park, at the time they encountered the victims in the blue Cutlass, they were no longer being shot at and they were no longer in fear, reasonably or otherwise, but were the aggressors pursuing the victims.

Third, the trial court found Dobynes's statements at the parole hearing about being angry, his fear of loss of respect, and wanting to make the victims pay, demonstrated the nature of the gang culture to which both Dobynes and defendant were a party. This was further bolstered by the jury's finding these crimes were undertaken for the benefit of, and in support of a criminal street gang.

The court also stated a final compelling piece of evidence was the encounter later that evening after the shooting where defendant maneuvered his car in a position to allow Dobynes to shoot at L.S., another rival gang member.

The trial court found defendant knew Dobynes intended to commit the crime of murder; defendant intended to aid and abet Dobynes in the commission of that crime; and defendant did so by his words and acts. Specifically, defendant, who already had problems with the Oak Park Bloods, brought Dobynes into Land Park (in Oak Park Bloods territory) with a loaded firearm. Despite having escaped, defendant and Dobynes identified the victim, defendant accelerated the SUV into position next to him and ducked

9

down to allow Dobynes to shoot them. The trial court found the prosecution proved beyond a reasonable doubt defendant committed second degree murder.

Defendant filed this appeal.

## DISCUSSION

Defendant contends the evidence was insufficient to find beyond a reasonable doubt he could be convicted of murder because the prosecution did not prove that the killing was not justified, and that defendant did not kill as a result of a sudden quarrel or in the act of perfect or imperfect self-defense. In his reply, he further argues the trial court erred in considering our prior opinion in his direct appeal.

### A.      Senate Bill No. 1437

Senate Bill No. 1437 (2017-2018 Reg. Sess.) was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

As relevant here, the bill amended section 188, which defines malice. Section 188, subdivision (a), now provides, in relevant part: "(a)  For purposes of Section 187, malice may be express or implied.  [¶] . . . [¶]  (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.  [¶]  (3) Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015, § 2.) The import of the change to section 188 requires "the prosecution to prove that all principals to a murder acted with malice aforethought. (§ 188, subd. (a)(3).) Though this change abolished the natural and probable consequences doctrine, it maintained the viability of murder convictions based

10

on implied malice, and the definition of implied malice remains unchanged. (§ 188.)" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)

Senate Bill No. 1437 also added former section 1170.95, which provides the procedure by which those convicted of murder premised on either a felony murder or natural and probable consequences theory can petition for resentencing if they could not be convicted of first or second degree murder because of changes to sections 188 or 189 by the bill. (Stats. 2018, ch. 1015, § 4; former § 1170.95, subd. (a).)

Upon the issuance of an OSC, the prosecution has the burden "to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3).)

## B. Substantial Evidence Standard of Review

In reviewing a trial court's findings the prosecution has proven defendant is guilty of murder under current law, "[w]e review the trial judge's factfinding for substantial evidence." (*Clements, supra*, 75 Cal.App.5th at p. 298.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*)

## C. Consideration of Appellate Opinion Facts

In his reply brief, defendant argues for the first time the trial court erred when it considered the recital of facts contained in our prior opinion. We will not normally

11

consider arguments raised for the first time in a reply brief (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9), however, we requested supplemental briefing from the Attorney General on this subject and granted its motion to augment the record to include the clerk and reporter's transcripts of the original jury trial submitted to the trial court in conjunction with the petition. We disagree with defendant.

At the time of the evidentiary hearing in this case, former section 1170.95, subdivision (d)(3) allowed "[t]he prosecutor and the petitioner [to] rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Stats. 2018, ch. 1015, § 4, subd. (d)(3).) It provided no definition as to what the record of conviction included, or how items in that record could be used by the trial court. Our Supreme Court had held an appellate opinion is generally "part of the record of conviction that the trier of fact may consider in determining whether a conviction qualifies under the sentencing scheme at issue." (*People v. Woodell* (1998) 17 Cal.4th 448, 457.) Shortly after the trial court ruled in this case, our Supreme Court reaffirmed appellate opinions are considered a part of the record of conviction in *People v. Lewis, supra*, 11 Cal.5th at page 972, but cautioned an appellate opinion may not supply all the answers.

Effective January 1, 2022, the Legislature amended former section 1170.95, subdivision (d)(3) with Senate Bill No. 775 (2021-2022 Reg. Sess.) to clarify what evidence can be admitted at the OSC hearing and to limit the use of the prior appellate opinions to "the procedural history of the case recited." (Stats 2021, ch. 551, § 2; now codified at § 1172.6, subd. (d)(3).) As a result, a trial court is no longer allowed to rely on the factual summaries in prior appellate court decisions when deciding a former section 1170.95 petition after an evidentiary hearing. (*Clements, supra*, 75 Cal.App.5th at p. 292.)

While the trial court cited our prior opinion in its recitation of facts, it had the full trial record, and relevant exhibits before it. The record indicates the trial court reviewed

12

that record when making its ruling rather than blindly relying on the summary of facts in our prior decision. The prosecution submitted the record as part of its opposition to the petition and the parties cited that record during argument at the hearing on the former section 1170.95 petition. Defendant points to no facts stated in the factual summary of our prior opinion but not contained in the underlying record, and our independent review of that record confirms the prior decision is in accord with the facts presented to the trial court at the prior trial. We conclude the trial court did not ignore any relevant evidence and its use of our opinion that summarized the facts does not invalidate its ruling.

D. Substantial Evidence Supports the Trial Court's Determination

The key question defendant argues is whether the prosecution proved beyond a reasonable doubt the killing was not the result of a sudden quarrel or committed in self-defense (perfect or imperfect). The trial court's finding the prosecution met its burden of proving beyond a reasonable doubt defendant could still be convicted of murder is supported by substantial evidence.

In response to a petition for resentencing, the trial judge need not hold a whole new trial, rather, "the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*Clements, supra,* 75 Cal.App.5th at p. 298.) To prove second degree murder, the prosecution must demonstrate " 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' (*People v. Knoller* (2007) 41 Cal.4th 139, 151.)" (*Clements*, at p. 299.) In this case, the elimination of the natural and probable consequences doctrine raises the question whether the evidence supports a second degree murder verdict under an implied malice theory beyond a reasonable doubt. Here, it does.

"[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that

13

act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, italics omitted.)

Substantial evidence supports the trial court's finding the prosecution proved beyond a reasonable doubt defendant knew Dobynes intended to shoot at the victim from the car; intended to aid Dobynes in the commission of this act; knew that shooting into a car is dangerous to human life; and acted in conscious disregard for that life.

The evidence before the trial court was defendant had preexisting problems with the Oak Park Bloods when they shot up his car. There was an ongoing feud between defendants' gang and the Oak Park Bloods, and further, the Oak Park Bloods considered Land Park in their territory. Despite this, defendant brought Dobynes into Land Park, knowing Dobynes was armed with a .50-caliber handgun. After a fight broke out and shots were fired, defendant left Land Park in his SUV. On the way out, defendant allowed Dobynes to fire his weapon into the air from his SUV. After he escaped the immediate threat and was a mile away from Land Park, he saw the victim's blue Cutlass and sped up to catch the car and said, "that's the fool that was shooting." Defendant drove his SUV into a position to give Dobynes a clear shot and ducked down as Dobynes fired his weapon.

Defendant also argues the trial court erred when it stated no one could identify the shooters in Land Park when the testimony was "everyone" was shooting at the defendant and his friends, including people in the blue Cutlass. The trial court's statement was only that no particular shooter was identified. This was true.

This does not end the analysis. The actual and reasonable belief a killing is necessary for self-defense is a complete defense to murder. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Further, an intentional killing based on the honest belief in the

14

need for self-defense that is not objectively reasonable— "imperfect" or "unreasonable" self-defense—operates to negate the element of malice and reduces the crime from murder to manslaughter. (*Ibid.*) In addition, a killing committed in response to a sudden quarrel or heat of passion negates malice and reduces a charge to manslaughter. (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.) "An unlawful homicide is upon ' "a sudden quarrel or heat of passion" ' if the killer's reason was obscured by a ' "provocation" ' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation." (*Ibid.*)

Defendant's argument the prosecution did not meet its burden fails because the trial court rejected defendant's and Dobynes' testimony about what happened between the time they left Land Park and when the murder occurred. Instead, the trial court found the evidence established defendant escaped the threat and became the aggressor when he came upon the victims in the blue Cutlass.

The trial court was entitled to reject defendant's and Dobynes's testimony and credit the other evidence. The trial court heard and saw their testimony, neither of whom testified at the original trial, observed their demeanor as they testified, and certainly appreciated their own bias in this case. Contrasted with these self-serving statements, the trial court had evidence from an independent witness standing at the scene who said, when the events were fresh in her mind, she heard a screech and then saw defendant pull up to the car and shots fired from the SUV into the blue Cutlass. We reject defendant's argument the trial court was required to credit E.R.'s trial testimony that she heard a boom before she looked up and saw the shooting. The trial court was entitled to credit her statement that no loud boom occurred (or shots were fired) before defendant attacked the blue Cutlass based on E.R.'s contemporaneous report to the police and prior preliminary hearing testimony. (*People v. Freeman* (1971) 20 Cal.App.3d 488, 494.)

Moreover, the testimony and corroborated contemporaneous statements of S.K. and A.A. further support the trial court's findings. Given the trial court's ability to see

15

and hear the testimonial witnesses' demeanor and their manner of testimony and review the contrary evidence in the record by persons without bias, the record provides substantial evidence supporting the trial court finding the prosecution proved beyond a reasonable doubt there was no self-defense or sudden quarrel here. (*In re Corey* (1964) 230 Cal.App.2d 813, 825-826 [the credibility of the witnesses is for the observation and consideration of the trier of fact, and will not be disturbed unless the testimony is inherently incredible].)

In addition, there was significant evidence of the gang culture from both Dobynes's testimony about his motivation in killing the victim and S.K.'s preliminary hearing testimony about how he threatened defendant with gang vengeance. Dobynes told the parole board about how he was angry; how he felt disrespected; how he was concerned about losing respect; how he was going to kill these guys; and how he was "gonna make them pay." Further, S.K. said he told defendant the entire Oak Park Bloods gang was going to keep an eye on him for killing his relative as a warning defendant should watch his back.

This gang retaliation mindset was further supported by the evidence defendant maneuvered his SUV in a place to where Dobynes could shoot at the second blue Cutlass containing a rival gang member in retaliation, after the first shooting. The jury also found this killing and the various shots fired by Dobynes were committed for the benefit of, or in association with a criminal street gang.

We reject defendant's claim there is no rational explanation as to how the blue Cutlass got in front of defendant's SUV as they raced down Freeport Boulevard after the fight and shooting at Land Park. The traffic conditions described by S.K. are explanation enough. In addition, this state of facts is equally explained by defendant's statement he stopped at the Kentucky Fried Chicken on Freeport to see if he had any bullet holes in his car.

We conclude substantial evidence supports the trial court's findings the prosecution demonstrated beyond a reasonable doubt this killing was an intentional act of gang revenge.

DISPOSITION

The judgment (order) is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

HOCH, J.

_____

RENNER, J.