[Crim. No. 4581.    In Bank.    Dec. 29, 1944.]

THE PEOPLE, Respondent, v. BENJAMIN H. WHITSON et al., Appellants.

Willard W. Shea, Public Defender, for Appellant Brigance.

No appearance for Appellant Whitson.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Ralph E. Hoyt, District Attorney,

Laurence E. Dayton and R. H. Chamberlain, Assistants District Attorney, for Respondent.

CURTIS, J.—The defendants, Benjamin H. Whitson and Thomas Earl Brigance, were jointly charged with the murder of Police Officer George C. Haas, in the first count of an information. They were charged with the robbery of the cashier of the Oaks Club, a card club, situated near the corner of Park Street and San Pablo Avenue in Emeryville, in the second count of the information. The defendant Brigance was also charged with a prior conviction of the crime of second degree murder in the State of Missouri, which he admitted upon arraignment. Whitson, a baker in the navy, is the brother-in-law of Brigance, who was employed in the Richmond shipyards. In a joint trial by jury, each defendant was convicted of murder in the first degree without recommendation, and each was convicted of robbery in the first degree. The death penalty was imposed upon the first count, and life imprisonment in the state penitentiary upon the second count. Thereafter a motion for a new trial as to each count of the information was denied by the trial court. By virtue of the provisions of section 1239 of the Penal Code, an automatic appeal was taken to this court from the judgments and from the order denying a new trial.

A strong case against the defendants was presented by the prosecution. Anthony Davilla, a taxicab driver employed by the Yellow Cab Company, chief witness for the prosecution, positively identified at the trial the two defendants, Whitson and Brigance, as the men who had committed the robbery of the Oaks Club on March 8, 1944, and Whitson as the man who had shot and killed Officer Haas with a machine gun when Officer Haas accosted them as they were leaving the scene of the crime. Davilla testified that at about 1:00 a. m. in the early morning of March 8, 1944, he was stopped in front of the Sears Roebuck store on Telegraph Avenue near 27th Street in the city of Oakland by a man whom he later identified as Brigance. Another man whom Davilla identified as Whitson got into the back seat with Brigance, slammed the door, and said, "Down Town." The men directed Davilla to drive to 12th Street and Broadway, and from there down 12th Street to Grove Street toward Emeryville. As they drove down Telegraph Avenue, Davilla turned around to talk to the men, who were not then masked.

Although there were no lights lit in the cab, the lights on the street corners were lit, and there were lights from streetcars. After driving about three blocks on Grove Street, Davilla heard something crash against the glass partition dividing the driver's compartment from the passengers' compartment, and the man whom he later identified as Whitson, who had a "long object" in his hand, said, "Keep your hands upon the wheel. Keep driving or else I will cut you in two. Keep your hands up where I can see you." Davilla kept driving until they finally stopped on Park Street about 50 or 100 feet from San Pablo Avenue. The two men then tied masks over their faces. Whitson used some kind of black material and covered his face to his eyes. The man identified as Brigance used a narrow piece of white cloth. The man identified as Whitson had in his hands a gun resembling a Thompson 45-caliber sub-machine gun called a "Tommy Gun" of the kind used in the navy. The two men then compelled Davilla to get into the back compartment, and Brigance tied his legs with a towel. Brigance tried to tie Davilla's arms securely with Davilla's own belt but was not able to do so satisfactorily. They, therefore, untied him, and ordered him to get out on the sidewalk. They then marched him ahead of them into the Oaks Club on San Pablo Avenue a few feet from Park Street. As they entered, the man identified as Whitson covered the card players in the club with his sub-machine gun, while the man identified as Brigance entered the cashier's cage, which was situated to the right of the entrance, and took the money which amounted to approximately $300. While this was happening, one of the card players spoke up and said, "They won't shoot," at which time the man with the machine gun said, "You think I won't"; and fired several shots into the ceiling and wall. The man whom Davilla later identified as Brigance then said, "Come along with me," and they went out of the club, leaving the man with the machine gun behind. Four or five feet from the entrance, they passed Officer Haas, a special police officer, who asked, "What is going on here? What is wrong here?" They continued on their way, and a few moments later Davilla thought he heard two or three shots. When they reached the taxi, the motor of which had been left running, the man identified as Brigance said, "Get behind the wheel of that cab." The man was carrying his hand in his

pocket as though carrying a gun, and Davilla climbed in behind the wheel. The man with the machine gun then came along, got into the cab, and ordered Davilla to make a "U" turn. After driving two or three blocks north on San Pablo, the man identified as Whitson said, "Get this thing moving. I had to lay that copper low." Following the directions of the two men who had taken off their masks, Davilla drove them to the point where he had originally picked them up and into the private driveway alongside the Sears Roebuck store. There the two men got out. Davilla immediately drove to the City Hall in Oakland where he reported the crime to the police and gave them a description of the two men. Davilla testified that the holdup man with the machine gun had on a dark coat and dark blue pants, and wore a light hat. His height was about 5 feet 7 inches; he was wearing a mustache, had black eyes, and had a growth of beard. The other man was a man with blond hair, and wore a pair of khaki-colored, dark tan breeches, and a faded blue shirt, and wore no coat or hat. While Davilla was at the City Hall, an officer examined the cab and found a magazine or clip loaded with 45 automatic cartridges on the rear seat. Davilla, later the same night, gave a description of the men to the Emeryville police. On his way to the hospital, Officer Haas died from shock and hemorrhage due to three bullet wounds.

Two boys testified that several days subsequent to March 8, 1944, they found a Thompson sub-machine gun dismantled and several clips of cartridges cached under and near a garage platform in the rear of the First Presbyterian Church at 26th Street and Broadway in Oakland. A ballistic expert testified at the trial that in his opinion the bullets which had killed Officer Haas had been fired from that gun. The Brigance home was on 27th Street between Telegraph Avenue and Grove Street, Oakland, a half-block from the Sears Roebuck store, and was one block from the place where the machine gun was found by the boys.

The cashier of the Oaks Club, Walter Whalen, described the man with the machine gun as being about 5 feet 7 inches or 5 feet 8 inches tall, slender in build, and weighing about 140 pounds. He was wearing a hat and a dark raincoat or "some type of slicker." The man who went into the cashier's cage was about an inch taller than the other man; his hair was brown or a "dirty blond," and he had on a light shirt and

light pants, and wore neither hat nor coat. Whalen testified that about thirty persons were present in the Oaks Club at the time of the holdup and that about $400 had been taken from the cashier's cage. He also testified that the sub-machine gun found by the boys, and an exhibit in court, was similar to the gun used in the holdup.

Fred Richmond, one of the card players who was at the first table just inside the door of the Oaks Club at the time, described the man with the machine gun as wearing a dark top coat and a soft hat. The other man, according to his testimony, was "lighter dressed."

Louis Martis, another card player at the Oaks Club, testified that the man with the machine gun was wearing a black coat and wore black gloves, and a hat; that the color of the hair of the man who took the money from the cashier's cage was light brown or almost blond, and he wore an open shirt and light tan pants.

An 18-year-old boy named Jones, a member of the United States Navy stationed at the Alameda Naval Base, testified that while he and Whitson were standing in line for mail, Whitson bumped him. When he protested, Whitson asked him if he thought he was tough. Jones replied he didn't think he was tough, but "I don't like anybody pushing me around." Whitson then said: "Maybe I have a deal for you." Later Whitson met Jones in the dormitory and told him he had to be sure he would go in with him on the deal before he would tell him about it, and that he (Jones) "had to be able to handle cold steel and maybe knock somebody's legs out from under him." He saw Whitson a few days later and Whitson volunteered that "the deal" was at the Oaks Club, and gave Jones the address by writing it on an envelope, and told Jones to go out and look it over. The address was San Pablo Avenue and 40th Street. Jones did go out to the Oaks Club and Whitson asked him what he thought about it. Jones replied that it was "all right." Whitson told him that the Oaks Club ought to be worth $4,000; that it would lead to bigger things; and that he knew another club "worth $10,000." Jones testified that Whitson showed him a pair of black thin leather gloves which he said was the type of glove to use as they wouldn't leave any prints, and told Jones he knew where he (Whitson) could get a "Tommy Gun." These conversations occurred during the second and third weeks of February, 1944.

After the arrest of Brigance, police officers removed from the home of Brigance, a dark blue trench coat, a pair of blue pants and a pair of brown pants. The trench coat was identified by the witnesses, Davilla, Richmond and Martis, as being similar to the coat worn by the man with the machine gun. The dark blue pants were identified by Davilla as similar to those worn by the man with the machine gun, and the other pair of pants as similar to those worn by the other holdup man.

Brigance, who took the stand in his own defense, testified that on the night of Tuesday, March 7, 1944, he, his wife, Whitson, and a young woman named Donna Coggen, left his house on 27th Street, between Telegraph Avenue and Broadway, and walked down to Telegraph Avenue. At 26th Street Mrs. Brigance and Miss Coggen left the two men to walk over to Broadway where Miss Coggen was taking a streetcar. He and Whitson went to a tavern on Telegraph Avenue where they were later joined by Mrs. Brigance. This was after midnight. They then crossed the street to another tavern but could not purchase any liquor there. He, Mrs. Brigance, and Whitson then returned to his home where Mrs. Brigance went to bed while he and Whitson had a bottle of beer. Whitson then left the house and he, Brigance, went to bed. He did not see Whitson until the following morning about 7 or 8 o'clock when Whitson knocked at the door and was admitted by Mrs. Brigance.

Mrs. Brigance corroborated the story told by her husband. She testified that after the three of them returned from the tavern, she went to bed while her husband and brother were drinking beer in the kitchen. After they finished the beer, Brigance had gone to bed and Whitson had left the house. She did not know whether Brigance went out again after she went to bed. She testified that next morning her husband was in bed asleep at 7 a. m. when her brother knocked and she admitted him.

Whitson also took the stand and testified to the same effect as Brigance as to his movements up to the time he left the Brigance home. He testified that just before he left the Brigance home and while he was drinking the beer he changed into his navy uniform. He stated that it was 1 o'clock when he left. He went first to a bowling alley known as the Broadway Bowl where he stayed 30 or 40 minutes and talked with a chief engineer in the merchant marine. He then went to

Compton's Restaurant where he had coffee and doughtnuts. This, so he claimed, was about 2 a. m. He remained 15 or 20 minutes and while there talked with a man named Murphy who was there with a couple of other men and girls. He then went to the Down Town show on 12th Street across from Compton's where he saw two full pictures and remained about two or two and a half hours. He got out of the show about 3:30 or 4 o'clock and went to San Francisco on an A train to get a drink. Some men on the corner had told him he could get a drink in San Francisco by asking some cab drivers near the Terminal. He couldn't get any whiskey in San Francisco, and after 35 or 40 minutes returned to Oakland and to his sister's house. He stated that he had been drinking all day, and that he was "fairly tight" but didn't know if he was drunk. Upon his cross-examination he admitted that he was familiar "to a certain extent" with the operation of a Thompson machine gun, as he "had had a few pointers showed" him on board ship, and admitted that he had a Thompson machine gun on the night of Tuesday, March 7, 1944. He also admitted that he had owned a powder blue felt hat which he had sold to some man, and a pair of dark kid gloves. He also admitted that he used eyebrow pencil to darken his mustache.

Donna Coggen testified that about 11:20 p. m. of the night of March 7, 1944, she left the Brigance home accompanied by Whitson and Mr. and Mrs. Brigance. At the Sears Roebuck corner, she and Mrs. Brigance left the two men and walked up 26th Street to Broadway where she caught her streetcar. She stated that Whitson that night was wearing civilian clothes with a gray hat and had a black mustache. Brigance was wearing khaki clothes, and a brown leather jacket and she did not believe he was wearing a hat.

No briefs have been filed in behalf of defendant Whitson, but the record has been examined with care for the purpose of determining whether the evidence is sufficient to support the verdict and whether during the trial of the case any error was committed which prevented the defendant from having a fair trial.

■ There can be no question that the evidence is sufficient to support the verdict. The defendant Whitson was positively identified by the taxicab driver as the man who operated the machine gun during the holdup of the Oaks

Club, and as the man who actually fired the fatal shot. Although defendant Whitson was not identified by any of the card players at the club during the holdup, the description of at least two of these witnesses tallies with the height, build, and general appearance of Whitson. The fact that the mustache worn by the holdup man was darker than the mustache worn by Whitson at the trial only strengthens the identification of Whitson as the guilty man, since he admitted on the stand that he was accustomed to using eyebrow pencil to darken his mustache. Clothes similar to the clothes worn by the man with the machine gun were found in the house occupied by Whitson's sister and brother-in-law. To the positive identification of Whitson by Davilla, must be added the fact that Whitson was familiar with the use and operation of a Thompson sub-machine gun; the fact admitted by him on the witness stand, that on the night of March 7, 1944, he had had a Thompson machine gun; and also the admitted fact that on the evening in question he was at the home of his sister and brother-in-law in the close neighborhood of the Sears Roebuck store where the holdup men were picked up by the taxicab.

Moreover, there is the extremely damaging testimony of Jones, also stationed at the Alameda Naval Air Base, who testified that a short time prior to the holdup, Whitson had suggested to him the proposition that they collaborate in the holding up of the Oaks Club with the explanation that it was "worth $4,000." The fact that Whitson said Jones "would have to be able to handle cold steel" and perhaps "knock somebody's legs from under him," furnishes convincing proof that Whitson was capable of committing such a crime, and contemplated murder if it was necessary to the accomplishment of the robbery. The testimony of this same witness that Whitson showed him a pair of soft black leather gloves to be worn when handling the machine gun, taken in conjunction with the fact that the man using the machine gun at the holdup did wear such gloves, strengthens the conclusion that Whitson was the person who planned and carried out the holdup of the Oaks Club with a machine gun, and was the person who, in leaving the scene of the crime, shot and killed Officer Haas.

It appears from the record that the trial was fairly and impartially conducted. Certain evidence of statements made by Whitson during the investigation of the crime was ex-

cluded upon the ground that the statements had been made in the presence of a navy officer and might possibly be considered to have been made under duress. No claim can therefore be made that evidence which should have been excluded was improperly admitted.

The jury, in bringing in its verdict of guilty undoubtedly relied upon the positive identification of Whitson by Davilla, the taxicab driver. They heard his testimony and were in a position to judge whether or not he was telling the truth. Likewise, the trial judge in denying the motion for a new trial, by so doing, necessarily affirmed his belief in the identification by Davilla. The fact that Davilla was able to positively identify the defendant at the trial, but did not give as detailed a description as might be desired of the defendant at the police station where he reported the crime immediately after its occurrence, detracts very little, if at all, from his positive identification of the defendant. His forced participation under threat of death in a machine gun holdup may well account for his failure to perceive and relate minute details. Moreover, although during the course of the cross-examination of Davilla, the defense attempted to give the impression that the description by Davilla at police headquarters was so sketchy that it demonstrated Davilla's inability to identify the men when he subsequently saw them. The description as given to the police was never presented to the jury, and it is impossible to determine the truth, if any, of this claim. ▆ However, it is a matter of common knowledge that although one may not be able to sufficiently describe a person so that the person may be recognized by another, yet one can himself recognize and identify the same person with certainty.

The crime of which defendants were convicted was murder of the first degree, in that it was committed in the perpetration of or attempt to perpetrate robbery, and on the record the only possible decision of an appellate court is an affirmance of the judgment.

▆ Briefs have been filed by the Public Defender of Alameda County in behalf of defendant Brigance, based upon a claim of mistaken identity, and the contention that although an alibi instruction was not requested by the defense, the failure of the trial court to give such an instruction *on its own motion* was prejudicial error which requires a re-

versal of the judgment. Appellant's argument is based upon the general proposition that the trial court is required of its own motion to give instructions on the general principles involved in a case. (8 Cal.Jur. 309.) Appellant does not question the fact that the rule in California is well established that, although substantial alibi evidence may be given by the defense, in the absence of any request for an instruction in respect thereof, it is not the duty of the trial court to give a specific charge upon that subject. (*People* v. *Foster,* 198 Cal. 112 [243 P. 667]; *People* v. *Jori,* 99 Cal.App. 280, 283 [278 P. 250]; *People* v. *Tracy,* 18 Cal.App.2d 444, 446 [64 P.2d 166]; *People* v. *Ramirez,* 21 Cal.App.2d 466 [69 P.2d 913]; *People* v. *Keilly,* 54 Cal.App.2d 764 [129 P.2d 939]; 118 A.L.R. 1303.) Appellant argues, however, that there are special circumstances in the instant case which require the defense of alibi to be treated as a general principle of law rather than a specific point developed through the evidence introduced at the trial.

We cannot agree with this contention. The special circumstances relied upon by appellant may be enumerated as follows: (1) The crime of which defendant stands convicted is a very serious crime—the crime of murder in the first degree involving the death penalty; (2) a separate alibi was offered in the instant case by the defendant Brigance which in no way depended on the strength of his codefendant's case; (3) the sole defense offered by defendant Brigance was the defense of alibi; and (4) the identification of the defendant Brigance was weak, and there was a conflict in the evidence.

We can see no logical ground for concluding that reversible error was committed by the trial court in failing to give an alibi instruction of its own motion in the case of a defendant charged with murder, whereas it is *not* reversible error if the crime charged be robbery, rape, or other crimes less serious than murder. It is true the penalty is more severe, but this arises simply because the crime itself is a more serious crime. A murderer is no more entitled of right to an alibi instruction by the trial court on its own motion than is a robber.

■ Neither do we perceive any valid reason why the fact that an alibi is offered by one defendant and not by another should change the general rule. In the case of *People* v. *Tracy, supra,* which involved a similar situation, the general rule

was held applicable. And if the sole defense of a defendant is an alibi, it would seem that less reason exists for requiring an alibi instruction on the court's own motion, since the general instructions regarding reasonable doubt, burden of proof, etc., would apply directly to the only defense, and there could exist no possibility of confusion.

We cannot agree with the claim that the identification of Brigance was weak. Although he was identified by only one person, the taxicab driver, that identification was definite and positive. It should be added that contrary to the claim that this witness Davilla lacked time and opportunity to gain a lasting impression of the two men who accosted him, forced him to drive them to the scene of the crime and forced him to accompany them into the Oaks Club, this witness had both ample time and opportunity to observe both men. Davilla testified that as he drove down Telegraph Avenue on the way to the Oaks Club he turned around and talked to them. Also when Brigance walked along to the right of him on the sidewalk as they left the Oaks Club, Brigance was unmasked, and both men were unmasked as Davilla drove them back to Sears Roebuck store where he let them out. This was ample time for him to fix their appearance in his mind.

In an attempt to show that inconsistent statements were made by Davilla which tended to discredit his testimony, the appellant points out that Davilla at one time testified that the lights were not lit *in* the cab and at another time stated that the headlights and lights *on* the cab were lighted. It is apparent to anyone familiar with the lights on the roof of the Yellow Cab taxicabs that these statements by the witness are entirely consistent.

The fact that the men were masked during the holdup adequately explains the reason they could be positively identified by only the one witness who had an opportunity to observe them without masks. However, the general description of the men as to general appearance, height, weight, and the clothes they were wearing all confirm the identification of these men as the guilty parties.

The record clearly demonstrates that the jury was warranted in bringing in the verdict of guilty. No reversible error was committed by the trial court.

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellant Brigance's petition for a rehearing was denied January 25, 1945.