[Crim. No. 34244. Second Dist., Div. One. June 25, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES DARRELL CARTWRIGHT, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and J. Courtney Shevelson, Deputy Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RIMERMAN, J.*—Defendant appeals from the judgment having been found guilty, after jury trial, of violation of section 211 of the Penal Code, robbery; that he was found to have used a handgun during the commission of the offense within the meaning of section 12022, subdivision (a) of the Penal Code, and that he personally used the gun during the robbery within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1) of the Penal Code.

*Assigned by the Chairperson of the Judicial Council.

## FACTS

At 9:30 a.m., on March 15, 1978, Michael Conover, age 21 years, was brushing his teeth in his apartment located at 8547 Imperial Highway in the City of Downey, County of Los Angeles. He shares this apartment with his brother and his brother's girl friend. The girl friend, Melody May Martin, was asleep in her bedroom at the time; the brother Billy Conover, had left earlier to attend college classes. Michael Conover was preparing to go to college classes.

There was a knock at the door and Michael Conover answered the knock. There were two male people at the door, both wearing hats, and one of them, the defendant, was holding a gun. Michael Conover identified the defendant as the man who had committed the robbery at his apartment. He recognized the defendant as the same person who had been to his apartment or the apartment complex where Michael lives on three other occasions for a total of about three and a half hours.

At defendant's order, Michael Conover backed into the apartment and the person with the defendant locked the door. Defendant asked Michael Conover for money and Michael took out his wallet and laid $7 on a table and the defendant picked it up. The defendant was holding the handgun. Defendant asked Michael if he had any dope. Michael went to the kitchen where he had two joints of marijuana; he laid them on the counter. Defendant asked if there was more. He walked into the bedroom where Melody Martin was in bed. Defendant's companion was standing in front of the door to the apartment to bar any attempted exit. There was only one door for entry or egress to the apartment. Defendant was in the bedroom a short time and came out.

Before leaving the apartment, the defendant said they were "cops" and asked the other person with him if they should "bust him for this." He told Michael Conover not to follow them and he pulled the telephone cord out of the wall. It was a phone jack.

Mr. Conover waited a minute after the defendant and his companion had departed. He ran to the balcony above his apartment to try to locate defendant and his companion, but could not see them. He then went downstairs and around the apartment building in an effort to locate them, but they were out of sight. He then got into his automobile and drove for a two-block area, but could not find the two people who had just robbed him. He went back to the apartment and into the bed-

room and told Melody Martin what had happened, and called the police after plugging the phone back in.

The defendant had worn a black trimmed hat and his companion wore a red ski cap.

The men had been in the apartment for about 20 minutes. Michael usually leaves at about 9:45 a.m. to get to school by 10 a.m. He had spoken to Melody Martin for about two minutes. Michael Conover estimates the time as 30 minutes from his answering the door until he got back from his search to tell Melody what had happened. He estimates that it took the police five minutes to come to the apartment.

Michael thinks that the defendant was high on angel dust because he "misslurred" his words. He knew that he was high from the previous times that he had seen the defendant in a similar condition.

Michael went to a mutual friend to determine defendant's name, after which he told the police.

While defendant was in the bedroom occupied by Melody Martin, she saw him come in, look around and walk out. He was in the room for about two minutes. She had seen the defendant on a prior occasion at her boy friend's apartment, the apartment where Michael Conover and Billy Conover lived. This was about three months before the incident here in question.

Officer Terry Pruitt of the Downey Police Department came to Michael's apartment at 9:55 a.m. on the morning of the robbery.

Paul Tully testified on behalf of the defendant that he lived in Bell Gardens near Downey; that on the morning of the robbery at the Conover apartment the defendant had come to his home, by prearrangement, to help him move his family to another residence. That they had gone to a U-Haul rental yard in Cudahay to rent a truck for this purpose. They got to the U-Haul establishment at 8:30 a.m. They left there, the defendant driving Mr. Tully's car and Mr. Tully driving the rented U-Haul truck. Mr. Tully had a receipt for the rental. They stopped at Charley Turner's house to pick him up to help them move. They got back to Mr. Tully's house near 9 a.m. They started loading the truck and did not finish until 12:30 or 1 p.m., when they unloaded at the new residence. The defendant was with Mr. Tully all this time.

Mr. Tully said that he and the defendant had been to the Conover apartment on some prior occasions.

Mr. Tully received a phone call from Michael Conover some time that day—in the afternoon. He was trying to find out the name of the defendant, whom he described to Mr. Tully. Mr. Tully said he knew who he was talking about because they referred to the defendant as "Slim," but he wouldn't give Michael the name. In fact, Michael had called earlier in the morning, when Mrs. Tully answered, but Mr. Tully refused to talk to him. There was a subsequent phone call by Michael to Mr. Tully in which the defendant was discussed by name, and Michael told Mr. Tully about the robbery and the defendant's involvement. Mr. Tully said it must be a mistake because the defendant was with him all day.

Mrs. Katherine Jennings, a neighbor of the Tullys testified that she saw the people loading the truck to move at about 8:45 to 9 a.m. when she left her home. She returned about 10:45 a.m. With Mrs. Jennings, when she left her home, was Mrs. Mary Smith, who corroborated the time they left and returned to Mrs. Jennings' home.

The defendant's testimony on the witness stand was the same as Mr. Tully's, to the effect that he was loading and moving furniture from the old residence to the new residence where it was unloaded. He testified that he did not go over to the Conover apartment at all that day; that he did not hold up Mr. Conover.

On cross-examination, the defendant testified that he did not tell the police that he had been helping Mr. Tully move because he didn't remember the date. However, he testified that he did talk to detectives after he was arrested, but he couldn't remember who they are. Later he testified that he didn't recall whether he had told a police officer that he had been with Mr. Tully that day. Under questioning by the court and the deputy district attorney, the defendant was unable to positively state that he had told the police or anyone else of his alibi.

"Q. This story that you were at Paul Tully's house helping him move when this incident went down, did you tell the police this story?

"A. That is not a story, that is the truth.

"Q. Well, did you tell them this version—

"Mr. Webber: I will object to that. Can we approach the bench?

"The Court: No. Did you tell them where you had been that day?

"The Witness: Tell them when—you mean when—

"The Court: When you were arrested on this particular charge—you were arrested, correct?

"The Witness: Right.

"The Court: When you were arrested did they tell you what you were charged with?

"The Witness: Yes, they did.

"The Court: Did they tell you how you were supposed to have been robbed?

"The Witness: Yes.

"The Court: Did you tell them that you could not have committed the crime because of the fact that you were with Mr. Tully?

"The Witness: No, I couldn't remember back that far till—it took me a little while to remember and what day and everything.

"The Court: When were you arrested?

"The Witness: I was arrested in April, the latter part of April.

"The Court: Which is just slightly more than a month afterward?

"The Witness: Right.

"The Court: The 15th of March is right smack in the middle of the month. You couldn't—didn't remember anything about it at the time?

"The Witness: No, I was arrested April 26th.

"The Court: Did you ever tell the police about the fact that you were helping Mr. Tully move.

"MR. WEBBER: Your Honor, I will have to—

"THE WITNESS: Yes.

"MR. WEBBER: Rephrase my objection again and ask to approach the bench.

"THE COURT: Your request is denied. [¶] Did you ever tell the police this version that we have heard today?

"THE WITNESS: Yes.

"THE COURT: When?

"THE WITNESS: Later on after I remembered where I was at on that date.

"THE COURT: When was that?

"THE WITNESS: When I told the police that?

"THE COURT: Yes.

"THE WITNESS: I can't remember, Your Honor.

"THE COURT: Who did you tell?

"THE WITNESS: I remember telling my Public Defender that.

"THE COURT: Well, did you ever tell a police officer that?

"THE WITNESS: Not that I remember.

"Q. BY MR. DAWSON: You see this man that was seated beside me this morning, Detective Langenhovel?

"A. Yes.

"Q. Do you remember talking to him after you were arrested?

"A. No.

"Mr. Webber: Again, Your Honor, I will object, ask to approach the bench.

"The Court: What is your objection. State it.

"Mr. Webber: May I approach the bench?

"The Court: State your objection.

"Mr. Webber: It is infringing upon his Fifth Amendment rights.

"The Court: Overruled. The question can be answered yes or no.

"The Witness: Will you repeat the question, please?

"Q. By Mr. Dawson: Do you remember talking to him after you were arrested?

"A. I talked to a couple of detectives. I don't remember if it was him or not.

"    .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. From that May date on, you don't recall offering that information to the Downey Police Department?

"A. No, I just put it to you this way. I was accused on something that date and remembered everything about the day moving, and that was the day we was moving. I was arrested for something that happened on that day that I didn't do. That is the only way I remember.

"Q. You didn't like being accused of something when you—that you claim you weren't there, did you?

"A. Would you like to be accused of something when you were somewhere else?

"Q. Well, didn't you think that perhaps if you had an excuse for being there, that if you told the police you might not—might not have to go through all this?

"MR. WEBBER: Again I will object. The Fifth Amendment rights are coming into account at this time, ask to approach the bench.

"THE COURT: Overruled. This man has waived any right against self-incrimination. He has taken the right to testify so there is no Fifth Amendment rights involved at this point.

"MR. WEBBER: Yes, there are.

"THE COURT: I beg to differ with you, sir. Once he takes the witness stand to testify in a cause of action he is relinquishing his entire privilege against self-incrimination.

"MR. WEBBER: May we please approach the bench? I am not talking about right now, Your Honor.

"THE COURT: Your objection is overruled. Please proceed with the trial.

"MR. WEBBER: I will object on the ground he is exceeding the scope of direct examination.

"THE COURT: That is overruled as well.

"MR. WEBBER: I would repeat the request to approach the bench then on this matter.

"THE COURT: Your request is denied.

"Q. BY MR. DAWSON: Did you think to offer this evidence or this information, excuse me, this information to the police department if you felt you were wrongly accused so they could check it out?

"A. No.

"Q. Did you think it was important that you were somewhere else on the date that you were accused of being in another location robbing somebody?

"A. Sure, I did.

"Q. But you didn't offer it to the police?

"A. Well, they didn't—I don't recall them telling me what date. They told me I was under arrest for armed robbery. That is at 4:30 in the morning."

The investigating officer, Patrick Langenhovel said it takes 15 minutes at the early hour of the morning herein involved to get from Mr. Tully's former residence to the Conover apartment. He further testified to the efforts he made by leaving his card at defendant's home on two occasions, talking to his relatives there and sending a letter to the defendant there. He finally met defendant on April 26, 1978, when defendant had been arrested. After being advised of his rights by Detective Langenhovel, the defendant said he had never been at the Conover apartment or that he knew Michael Conover or Melody Martin, or that he had ever been to the apartment complex. He denied committing the robbery.

Mrs. Giovanna Tully testified that the defendant and her husband and Charley Turner were loading the truck during the morning, but she had been in the house and upstairs helping other tenants pack so that they could move also, as the building was under new ownership with some new rules.

After a jury trial the defendant was found guilty and the jury found to be true the allegations that the appellant was armed and personally used a firearm during the commission of the robbery.

The court denied appellant's motion for a new trial; he was committed to the California Department of Corrections for a diagnostic study pursuant to section 1203.03 of the Penal Code. Upon his return to court the appellant was denied probation and sentenced to the California Department of Corrections for the base term of three years for the conviction of the robbery, Penal Code section 211 violation, a consecutive two years under Penal Code section 12022.5 for personal use of the firearm during the robbery, for a total of five years. The armed allegation of section 12022, subdivision (a) of the Penal Code, was stayed, or suspended.

## ISSUES

Appellant ascribes prejudicial misconduct of the court and the prosecutor and violation of his right against self-incrimination when

appellant was asked on cross-examination whether he ever told the police of his alibi.

Further, appellant's right to remain silent was violated when evidence was permitted to show appellant failed to respond to two messages and a letter from the investigating officer.

In other words was there a violation of appellant's privilege against self-incrimination when asked on cross-examination whether he had ever told the police of his alibi; and by evidence admitted to show his failure to respond to police attempts to contact him?

## DISCUSSION

■ The accused in a criminal investigation, or a defendant in a criminal prosecution, need not assist the police or prosecutorial agencies in proving their case against him. He has a right against self-incrimination. (Cal. Const., art. I, § 15.)[1]

The appellant cites us to the case of *Allen* v. *Superior Court* (1976) 18 Cal.3d 520 [134 Cal.Rptr. 774, 557 P.2d 65]; and *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], as authority for the proposition that a defendant may not be compelled to disclose his alibi.

In the *Allen* case, the court requested the names of witnesses prior to voir dire of the jury. The court wanted to announce the names of witnesses to the prospective jurors so that any relationship or acquaintanceship could be made known. The defendant opposed this procedure as an infringement of his right against self-incrimination. The majority of the court, following *Prudhomme* v. *Superior Court, supra,* ordered that a writ of prohibition issue, whereby the trial court was not permitted to require defendant to divulge the names of his witnesses. The court reasoned that the trial court has not complied with *Prudhomme* standards for such disclosure. If disclosure were made, it could supply a link in the investigation and aid the prosecution in its case against the defendant, thereby acting to divest the defendant of the protection afforded by article I, section 15 of the California Constitution.

---

[1]"...... [¶] Persons may not...be compelled in a criminal cause to be a witness against themselves,..."

In *Prudhomme v. Superior Court*, 2 Cal.3d 320, the California Supreme Court issued a peremptory writ of prohibition restraining the trial court from enforcing a discovery order compelling the defendant to divulge the names, addresses and expected testimony of witnesses. The court reasoned that if this disclosure had a tendency to incriminate the defendant, it was forbidden. The exact words of the *Prudhomme* rule are that "...the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question cannot possibly have a tendency to incriminate the witness." (*Prudhomme v. Superior Court, supra*, at p. 326.)

Although the *Allen* and *Prudhomme* cases set forth rules relating to discovery and the disclosure of witnesses, they do not tell us about a situation such as in the case at bar, where the defendant did make a statement to the police and where he did testify in his own behalf at his trial. Further, it would appear that the *Allen* case and the *Prudhomme* case are distinguishable on their facts from the case presently before us. This is again distinguishable from the case of *People v. Talle* (1952) 111 Cal.App.2d 650 [245 P.2d 633], cited by appellant. In the *Talle* case the defendant never made any statements before the trial, on the advice of counsel. A review of the case does not indicate anything as to an alibi as contended by counsel. However, the *Talle* case, at trial, was so fraught with error that it may be possible to read into it that for which appellant contends.

Appellant cites us to other cases, which seem to state that there can be no cross-examination of defendant where he makes no statement to the police after his arrest. This may be true, but factually does not seem to apply to the case at bench.

On direct examination the appellant testified that he had been at Mr. Tully's house a half a day. That he had not been to Mr. Conover's house "that morning around 9:20 or 9:15," although "Q. You had been to Mr. Conover's house at some time in the past? [¶] A. Yes." Prior to this the appellant had testified that he left his house on March 15th at around 7:30 a.m. on the day of the incident.

■ Since this testimony was elicited on direct examination, it was proper for the deputy district attorney to inquire concerning the date, time and as to a conflict in statements made. It is true, perhaps, that a trial judge should not appear to take sides by his questioning still the judge has the discretion in the manner in which a trial is conducted

(Pen. Code, § 1044; *People* v. *Pierce* (1970) 11 Cal.App.3d 313 [89 Cal.Rptr. 751]), especially where CALJIC No. 17.30[2] instruction is given. (*People* v. *Rigney* (1961) 55 Cal.2d 236 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 533 [116 Cal.Rptr. 260, 526 P.2d 268]; *People* v. *Alfaro* (1976) 61 Cal.App.3d 414 [132 Cal.Rptr. 356].)

■ A defendant testifying on his own behalf at a criminal trial exposes himself to cross-examination and to explanation concerning his credibility and the reliability of his testimony. (*People* v. *Hathcock* (1971) 17 Cal.App.3d 646 [95 Cal.Rptr. 221].) "[O]nce a defendant voluntarily elects to testify in his own defense, nothing prevents the prosecutor from inquiring fully into the facts and circumstances surrounding his assertions or from introducing evidence through cross-examination which explains or refutes his statements. (71 Cal.2d at p. 770.)" (*Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 325 [85 Cal.Rptr. 129, 466 P.2d 673].) "'...or the inferences which may necessarily be drawn from them.'" (*People* v. *Tealer* (1975) 48 Cal. App.3d 598, 604 [122 Cal.Rptr. 144].)

■ The people are allowed latitude in their cross-examination of the defendant where he makes a general denial of the charge. (*People* v. *Eisenberg* (1968) 266 Cal.App.2d 606 [72 Cal.Rptr. 390]; *People* v. *Hernandez* (1976) 63 Cal.App.3d 393 [133 Cal.Rptr. 745]; *People* v. *McClellan* (1969) 71 Cal.2d 793 [80 Cal.Rptr. 31, 457 P.2d 871].)

■ The defendant, who testifies to matters inconsistent with the evidence presented by the prosecution may not limit the cross-examination to a recital of the matters to which he testified, but may be examined with respect to facts or denials implied in his testimony in chief. (*People* v. *Cornejo* (1979) 92 Cal.App.3d 637 [155 Cal.Rptr. 238]; *People* v. *James* (1976) 56 Cal.App.3d 876 [128 Cal.Rptr. 733].)

Where appellant says that at the time of the robbery he was helping Mr. Tully to move, it is proper on cross-examination to ask him if he told this to the police when he talked about the case with them after his

---

[2]CALJIC 17.30 provides as follows: "I have not intended by anything I have said or done, or by any questions that I may have asked, to intimate or suggest what you should find to be the facts on any questions submitted to you, or that I believe or disbelieve any witness.

"If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion."

arrest. This is proper for impeachment purposes. (*People* v. *Farley* (1968) 267 Cal.App.2d 214 [72 Cal.Rptr. 855]; *People* v. *Barker* (1979) 94 Cal.App.3d 321 [156 Cal.Rptr. 407].)

The *Farley* case seems to be in point with the case at bench. Mr. Farley, the defendant testified in his behalf that on the night of the robbery, he was at some other place with two other people. On cross-examination, he was asked by the prosecutor if he told this to the police after his arrest. He said "'No. I don't think so, I don't know.'" (*People* v. *Farley, supra*, 267 Cal.App.2d 218-219.)

When we look at appellant's testimony here, we find that he stated that he had been at Paul Tully's house all morning and had not gone to the victim's apartment to rob him. On cross-examination appellant stated that he had been to the victim's apartment in the past but not on that morning and had not seen Michael Conover on the 15th, the date of the robbery. When the prosecutor went on to ask if appellant had told this to the police there was an objection and a request to approach the bench by appellant's attorney. The court denied this request and the court elicited from the appellant that he did not tell the police that he was with Mr. Tully at the time the crime was committed. Appellant said he could not remember back to the time of the incident of the 15th. He was arrested on April 26, of the same year as the robbery herein.

Defendant said he wasn't there at the time of the robbery. In fact, he said he had never been there and did not know the people there. If defendant was not at the place of the robbery, then he must have been somewhere else. Doesn't this in effect say, I have an alibi. I was not at the place of the robbery when the victim says I was. I was somewhere else.

At the time of trial, the defendant comes to court to testify in his own behalf. Now for the first time he fills in the missing links to his alibi. He says, I know where I was at the time of the robbery. I was helping Mr. Tully move.

As the court further questioned the appellant, he stated that he had told the police that which he had testified to in court, that he was with Mr. Tully at the time of the crime. Later he said he didn't remember telling a police officer this version of his testimony.[3]

---

[3]See footnote 1, *ante.*

These are proper avenues of inquiry in an effort to discredit the reliability of the witness and in an effort to impeach his testimony. (*People v. Farley, ante.*)

It must be remembered, that the prosecution had presented eyewitness identifications testimony by Michael Conover and Melody Martin, that the appellant had been in their apartment at 9:30 a.m., on March 15, 1978. There was ample opportunity for Michael Conover to observe the appellant for the 20 minutes that the transaction took place. He had known and seen the appellant on previous occasions. He searched him out by his nickname "Slim." He identified the appellant in court at the time of the trial. This alone was sufficient to sustain a conviction. (*People v. Whitson* (1944) 25 Cal.2d 593 [154 P.2d 867]; *People v. Reese* (1963) 220 Cal.App.2d 143 [33 Cal.Rptr. 561]; *People v. Farley, supra*, 267 Cal.App.2d 214.)

There was no constitutional infringement of appellant's rights in this action. The jury was free to believe or disbelieve the testimony presented by the witnesses. The jury was free to resolve consistencies or inconsistencies in the testimony of the witnesses. The defendant told the police a little bit, why not the rest?

■ We do not think that the prosecution should be foreclosed from inquiry as to the sequence of events testified to by appellant. Such questioning as herein objected to by appellant does not reach constitutional limits and if it may be ascribed as error, it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed. 2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

As to appellant's assignment of error to the admission into evidence of Officer Langenhovel's attempts to locate appellant and his silence or nonresponse thereto, we determine to be without merit. This testimony came in by way of rebuttal by the prosecution. Officer Langenhovel testified that he had defendant's name the day after the robbery. He had a last known address of the appellant, and went there two days later. No one was there, so he left his business card addressed to appellant, and for him to call Officer Langenhovel. A week later, he sent a letter to appellant at the address he had for him. There was no response. Three days later he again went to the address and spoke to appellant's sister and left a card for appellant to call him. The sister said he is home late at night.

On surrebuttal by appellant, it was shown that appellant's father was aware that appellant had received a letter from the police department. The father had read the letter. It indicated that a crime had been committed in a vehicle registered to appellant. Appellant never had a car registered to him.

The thrust of this testimony, elicited by appellant is that he had received a letter from the police department in regard to a crime having been committed in a car registered to him. Since he did not own a car there was no reason to reply to it.

This testimony was intended to counter the testimony of Officer Langenhovel as to his attempts to contact appellant, during the officer's investigation of the matter.

■ It is quite evident that appellant knew that the police were trying to contact him and his failure to respond is relevant as to his consciousness of guilt. (*People* v. *James* (1976) 56 Cal.App.3d 876 [128 Cal.Rptr. 733].) There is no mistaking the import of a persistent police inquiry of a party. A simple telephone call could have been made to the police to reveal the fact that appellant never owned an automobile. There was no error in allowing the evidence in.

The judgment is affirmed.

Lillie, Acting P. J., and Hanson (Thaxton), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 21, 1980. Bird, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.