Filed 10/22/13  In re C.H. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re C.H., a Person Coming Under the Juvenile Court Law. | B246237 (Los Angeles County Super. Ct. No. CK86716) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>T.H.,<br><br>        Objector and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Jacqueline H. Lewis, Commissioner.  Affirmed.

Boxer McLaughlin, Robert McLaughlin, under appointment by the Court of Appeal, for Objector and Appellant.

Roni Keller, under appointment by the Court of Appeal, for Objector and Respondent.

# INTRODUCTION

Objector and appellant T.H. (father) appeals from the juvenile court's exit order that, in effect, reinstated a family law custody order upon termination of the juvenile court's jurisdiction. According to father, the juvenile court abused its discretion when it failed to consider the best interests of his daughter, C.H., and instead improperly deferred to the family law court on the custody issue. In response to father's appeal, C.H.'s mother (mother) contends that because the issues that gave rise to the detention of C.H. and the change in custody had been resolved, it was not an abuse of discretion for the juvenile court to return C.H.'s custody to the schedule established by the family law custody order.

We hold that the juvenile court's exit custody order reaffirming the family law custody order was reasonable under the circumstances and, therefore, not an abuse of discretion. Accordingly, we affirm the juvenile court's custody order.

# FACTUAL BACKGROUND

In 2010, the family law court ordered that C.H. would live primarily with mother and visit father every other weekend and on Thurdays in the off weeks. On February 23, 2011, DCFS filed a Welfare and Institutions Code section 300[1] petition concerning C.H. The petition alleged a single count under section 300, subdivision (c): "[C.H.]'s mother, . . . and father, have emotionally abused [C.H.] engaging in an ongoing highly contentious family law custody battle. The mother inappropriately involved [C.H.] in the divorce and custody issues resulting in [C.H.'s] total alignment with the mother regarding contact and interaction with the father. The mother has in the past spoken to [C.H.] of the father in negative terms. [C.H.] has been described as emotionally distressed with compromised psychological resources due to parents' ongoing emotional abuse of [C.H.].

---

[1]      All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

2

The parent's emotional abuse of [C.H.] places [her] at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression and withdrawal."

At the detention hearing, the juvenile court made the following observations: "The Court: What I read in these reports is disgusting, what you've done to this little girl. You two better get over it. Because I'm not trying to—I'm not trying to punish you, I'm trying to protect her, which Judge Lewis has been trying to do, but with limited ability to do so because he has to choose one of you. I don't have to choose one of you. I can put her in foster care. [¶] And the next thing I hear about the two of you making cross-allegations and speaking badly of each other in front of her—you're shaking your head to show me you understand what I'm saying? [¶] I guarantee you can talk to your attorneys, you don't want to try me on this one. They will tell you I'll do it in a heartbeat. [¶] That's enough. You're adults. Act like it. Putting this little girl through this hell you've put her through, it's unconscionable, unconscionable. I don't know what's going on, but if you two don't learn to love her more than you hate each other, you're going to lose her; through me, and through herself. [¶] . . . [¶] It is not you against him; it is not you against her. At this point it's both of you against me, okay? So get it together and stop tearing her apart or I'll do it for you. [¶] The court find a prima facie showing that [C.H.] is a person described by Welfare and Institutions Code section 300, subdivision (c). [¶] . . . [¶] Based on all counsel being in agreement at this point, the court will allow the child to remain released to the parents, but that's on a very short thread. [¶] I'm ordering family maintenance services. I believe the Department has made the referrals already . . . ."

At the April 2011, jurisdiction/disposition hearing, mother and father pleaded no contest to the petition. The juvenile court sustained the petition, declared C.H. a dependent of the court, and ordered her placed in the home of her parents under the supervision of DCFS. The juvenile court ordered the parents to participate in Parents Beyond Conflict, conjoint counseling with Dr. Gibb, and individual counseling to address case issues. The juvenile court further ordered DCFS to provide C.H. individual

3

counseling and conjoint counseling with her parents if recommended. The parents were ordered not to discuss the case with or around C.H.

On December 2, 2011, DCFS filed a subsequent petition under section 342. The subsequent petition alleged two counts against mother only, as follows: "b-1. On 11/29/2011, [C.H.]'s mother, . . . placed [C.H.] in a detrimental and endangering situation in that the mother transported [C.H.] in a vehicle while . . . impaired by prescription medication. Such a detrimental and endangering situation established for [C.H.] by the mother endangers [C.H.'s] physical health and safety, placing the child at risk of physical harm, damage and danger. [¶] b-2. [C.H.]'s mother, . . . is a current abuser of prescription medication, which renders the mother incapable of providing regular care for [C.H.]. On 11/29/2011, the mother was impaired by prescription medication while [C.H.] was in the mother's care and supervision. Said substance abuse by the mother endangers [C.H.'s] physical health and safety and places [her] at risk of physical harm and damage."

At the initial detention hearing, the juvenile court detained C.H. from mother and placed her in father's custody. At a continued detention hearing, the juvenile court found that continuance in the home of mother was contrary to C.H.'s welfare and placed C.H. in father's home, with monitored visits for mother.

At the continued February 2012 contested jurisdiction hearing, the juvenile court sustained paragraph b-1 of the subsequent petition, dismissed paragraph b-2, declared C.H. a dependent of the court, and continued C.H. in father's custody. At the March 2012, disposition hearing, the juvenile court entered a modified custody order that read: "1. Mother's custodial time of [C.H.] shall begin Saturday mornings at 9:00 a.m. through Monday mornings. Mother is responsible for bringing C.H. to school on time Monday mornings; [¶] 2. Father's custodial time of [C.H.] shall begin Mondays after school to Saturdays at 9:00 a.m., except for the 5th weekend of a month, which [C.H.] will spend with father; [¶] 3. Mother may be present at school events and shall be notified of dental and doctors appointments; [¶] 4. [C.H.] shall remain in therapy two times a month with Dr. Bissada; [¶] 5. Separate parent teacher conferences shall be arranged if possible, [C.H.] shall not receive outside tutoring."

4

On June 28, 2012, mother submitted a section 388 petition seeking a change in the custody order. In her declaration in support of the petition, mother stated that she was attending therapy consistently, had completed all ordered programs, and had submitted to 20 random drug tests over the past six to seven months, each of which was "clean." Mother explained that she and father had attended monthly conjoint therapy sessions and that she and father did not argue or discuss parenting issues in C.H.'s presence. Mother asserted that she no longer said anything critical about father in C.H.'s presence.

According to mother, father and C.H.'s therapist had no objection to a "50-50" alternate week custody arrangement. She believed C.H. "strongly desire[d] to spend more time in [mother's] care . . . ." C.H. was extremely disappointed that she was not allowed to return "'home'" after the last court date. From mother's perspective, the current custody schedule was preventing C.H. from spending time with her extended family, including her elderly maternal grandparents.

Mother maintained that, contrary to statements made by DCFS, C.H.'s academic performance had not significantly improved under father's care. As for C.H.'s improved performance in reading under father's care, mother attributed that improvement to the "reading intervention" that C.H. was receiving at school.

Mother disagreed with DCFS's report that C.H.'s teacher noticed C.H. was "nervous and unsure of herself" on Mondays when she returned from weekend visits with mother. Mother also disagreed that she "'frequently'" approached C.H.'s teacher, and explained that since the juvenile court changed the custody order in December 2011, all of mother's contact with C.H.'s teacher had been in accordance with court orders.

Mother believed that the CSW "paint[ed mother] in a poor light and characterize[d her] as having parenting deficiencies, even when the asserted misdeed could not possibly have occurred." Mother also believed that the CSW "paint[ed] [f]ather in a positive light, even when not deserved. [The CSW] glossed over the angry confrontation between father and [C.H.'s] therapist, Dr. Bissada. [And the CSW] glossed over when [father] lost his temper with the [visitation] monitor and physically injured him." Mother concluded that, notwithstanding the CSW's report, "all three therapists involved with our

5

family have stated and would testify that it [would be] safe and in [C.H.'s] best interest to spend more time with mother."

On July 31, 2012, DCFS filed its response to mother's section 388 petition. DCFS reported that during a July 17, 2012, interview, mother stated that since the December 2011 detention of C.H., mother had participated in therapy on a monthly basis, and she also participated in drug testing. In addition, mother attended conjoint counseling with father.

Mother told the CSW about an incident with father that took place at a mall concerning a dispute about mother's visitation with C.H. But mother denied any other coparenting issues or conflicts with father.

Mother informed DCFS that C.H. was achieving "2's" in reading comprehension which caused mother concern over C.H.'s "problem." Mother explained that C.H.'s reading problem had been identified in 2010, and even though C.H. was experiencing the same problems, nothing was being done to rectify them.

Mother had always paid for tutoring for C.H. while she was in mother's custody. Mother further informed DCFS that when she read with C.H., the child "invert[ed] words, such as saw and now." Mother said that C.H. was "not on track and [not] at grade level."

Mother complained that the CSW assigned to the case could not observe mother and C.H. interact because the CSW was not working on the weekends that mother had custody. As a result, the CSW's reports were "misleading and one-sided." According to mother, her visits with C.H. that began in March 2012, were "going really good." C.H. was not experiencing any issues transitioning from home.

Mother also explained that C.H. had cousins with whom she was close, but due to the current weekend custody arrangement, it was difficult for C.H. to spend time with them. Mother believed that C.H. missed "her house, her friends, [and] yard, and she "want[ed] to come home."

Mother informed DCFS that based upon assistance from her co-parenting counselor, "she was more aware of how she was conducting herself" around C.H.'s

6

teacher and school. As a result, mother was no longer upset at C.H.'s school and was "very cognizant of her behavior" there. Concerning a reported incident at a school book fair, mother stated that because it was teacher appreciation day, she brought the teacher a flower and a book from the "teacher's wish list," but that was the extent of the incident.

Regarding the CSW's report that C.H.'s therapist had stated that C.H. seemed coached during therapy, mother advised that she spoke with the therapist who denied making any such statement to the CSW. Mother also denied discussing court or the case with C.H.

During a telephone interview with a CSW, father explained his version of the incident at the mall concerning mother's visitation with C.H. at a dance class. Father admitted arguing with mother over whether C.H. should attend a "hip-hop" class or go with mother for a visit, but he denied yelling at mother.

Father reported that under his custody and supervision, C.H.'s homework was "consistent." There was a time around Halloween when C.H. said she did not like school, did not want to attend school, and complained that her teacher did not like her. But father spoke to the teacher about C.H.'s statements and since that time, C.H. had not complained about attending school. According to father, C.H.'s teacher "really worked" with C.H. and "really cared for her." Father observed that C.H.'s homework was not important to mother because she only "wanted to do fun things with the child." Father said that although C.H. had achieved some "2's" in school, she had improved and "almost had a 3 in the subjects."

Father also reported that C.H. did attend summer "intervention" for math at her school. C.H. also attended a Thursday reading class at Pierce College during which she worked on phonics and reading for "an extra 45 minutes after the class." In addition, C.H. also met with the teacher at the library for an additional hour and a half on Mondays. Father explained that he had attempted to place C.H. in "intervention" at school, but her grades were not deficient enough to qualify. C.H. had improved in math, but struggled with word problems. C.H. was proud of the "4's" she had received on her year-end report card. C.H.'s teacher advised father that C.H. "need[ed] a lot of praise."

Because C.H. responded well to her teacher's praise, "father followed the teacher's lead." Although C.H. needed to work on a genetic speech impediment, she was reading independently and had "improved a lot." C.H. no longer challenged father about the need to read.

It was father's understanding that mother took C.H. to visit her therapist, Dr. Bissada, twice a month. Father did not think Dr. Bissada was the best therapist for C.H., but "everyone wanted [C.H.] to stay with her." Father did not want Dr. Bissada to think that he was the parent who was coaching C.H.

DCFS reported that father was affectionate with C.H. and she loved him. When father picked C.H. up on Mondays, she was "outgoing and happy to see him." Father ensured that C.H. arrived at school on time and that she had breakfast before school every day. C.H. had told father that she "want[ed] to go back to her mother's home." Father wanted the custody arrangement to remain the same. Father was willing to change the custody arrangement slightly so that he would have custody of C.H. every other weekend. Spending some weekends with father would allow C.H. to visit friends and spend time with father's family. Father, however, did not want "a one week on/off schedule." Father believed that if mother had that much time with C.H. during the school week, C.H.'s school attendance would diminish, she would not always have breakfast, and she would be tardy more often. When mother was responsible for taking C.H. to school, C.H. was "the last one in the class."

Father voiced his concern to DCFS that mother continued to speak with C.H. about court issues. Mother also advised C.H. to ask father if C.H. could spend more time with mother in an effort to make father appear to be the "bad guy." Similarly, mother would invite one of C.H.'s friends to sleep over on Sunday night so when father came to pick up C.H. on Monday, she would want to stay and play. Mother sometimes would have C.H. call father to negotiate later pick-up times, but father thought mother should make that call instead of the child.

Father confirmed that he and mother were continuing to meet with Dr. Gibbs, the co-parenting counselor, once a month. They could not afford to see him more often.

8

Father reiterated to DCFS that he was opposed to a "one week on one week off" custody schedule. Father "really value[d] school and wanted [C.H.] to have more opportunities." He wanted C.H. to learn commitment and discipline through school. But mother told father that "there were more important things than school." When C.H. was in mother's custody, she was always sick and found many excuses not to attend school.

Father concluded his interview with DCFS by stating that some of mother's statements in support of her section 388 petition were not true. For example, although mother claimed that C.H. did not have homework on weekends, the truth was that C.H. had spelling homework on weekends. Father also pointed out that mother did not attend parent-teacher night and was one of the only parents who did not attend.

A CSW reported that C.H.'s report card showed consistent attendance, academic scores that had either remained the same or had improved, improvement in all areas of "work study habits," and overall improvement during the course of the year.

A CSW met with C.H. during a scheduled home visit. C.H. showed the CSW her homework and appeared to be proud of it. C.H. also showed the CSW "many of her accomplishments." C.H. reported that she no longer thought she was being "hypnotized" and that she was "pretty much" getting along with [father] and getting along "really good" with [mother], and that [her] parents [were] "pretty much getting along with each other."

During a second meeting with C.H., however, C.H. asked the CSW "why can't kids decide who they live with" and "when can I talk to the judge again." C.H. said she wanted to speak with her lawyer and tell her she wanted to live with mother and that it was not "fair." C.H. also told the CSW that she did not want to live with father because "he had a sharp thing in the carpet that hurt her foot, and [father made] her go to the movies with her friends [when] she want[ed] to go to the beach." C.H. began to cry and then told the CSW that she did not "like it [at father's]." C.H. related an incident between father and mother at dance class and voiced apprehension that father was "going to get mother in trouble for taking [C.H.] out of dance class early." According to C.H., father told her that he was "going to call the police on [mother] and get her in trouble

9

[with the CSW]." C.H. reported that father "cheats, he steals, [and] he lies." C.H. also stated that father hit her once, but when she was pressed for details, she said "never mind." C.H. continued to cry about wanting to live with mother and it took the CSW five minutes to calm her down.

The CSW next conducted a telephone interview with Dr. Gibbs, the co-parenting counselor. He reported that although the parents were managing better to keep the differences between them away from C.H., they "still [had] them." He believed the parents could have done a better job of deescalating the incident at the dance class and should have "backed off" sooner. According to Dr. Gibbs, the parents did not discuss custody issues well. Mother did not have the same "alliance" at C.H.'s school as father had and mother believed that C.H. needed additional assessments that father did not believe were necessary. Dr. Gibbs believed more therapy sessions with him would be helpful to the parents. Once school began, he planned to help the parents deal with homework and school issues. The parents were still dependent on counseling to work on their coparenting, but they could "contain some conflicts better." The parents seemed more intent on lecturing one another than on problem solving. Dr. Gibbs noted that mother appeared more alert during sessions and no longer had issues with being on time or "slurred speech." He did not give an opinion on a change in custody, but did state that he would not "encourage too dramatic of a change due to both parents being fragile." He also stated that if custody was going to change to a "50/50" arrangement in the fall, he would "recommend a more gradual change in that direction."

When the CSW interviewed C.H.'s therapist, Dr. Bissada, she confirmed that Dr. Bissada saw C.H. every two weeks. Dr. Bissada did not have any current contact with father because the last time he came to her office, he became upset with her in front of C.H. Father also had an outstanding balance due for C.H.'s therapy sessions, and she had sent him "bills" for the balance. Dr. Bissada believed that C.H. was doing well in father's care. She had structure in father's care, completed her homework, and arrived at school on time. But, Dr. Bissada observed C.H. also enjoyed her time with mother and was emotionally bonded to her. C.H. missed mother because father was "emotionally

unavailable" and, athough he was well intended, he could be "harsh." Dr. Bissada noted that mother's behavior with C.H. had improved and C.H. was no longer as "scripted" in therapy sessions as she had been before. Mother did a "good job" of following up with DCFS and therapy after C.H. allegedly, according to mother, was molested by a tutor. Mother was no longer as "hysterical" as she had been. C.H. told Dr. Bissada that she wanted to speak to a lawyer because she needed to talk to mother about "girly" things. Dr. Bissada encouraged C.H. to talk to both parents about such issues.

C.H. discussed the incident at dance class with Dr. Bissada and was upset by it. Based on what she had witnessed at her office, Dr. Bissada did not know how well father was able to control his anger. Although father was good with academics and structure, C.H.'s grades had not improved that much, and Dr. Bissada expressed concern that C.H. was still below average in basic subjects.

The CSW reported to the juvenile court that the parents continued to struggle to coparent effectively C.H., despite monthly meetings with Dr. Gibbs. According to the CSW, "DCFS [did] not recommend making any significant custody changes for [C.H.]." Mother had not demonstrated that there had been a serious change of circumstances since the last hearing. None of the CSWs involved in the case was in favor of major changes in custody. DCFS recommended that C.H. remain primarily in father's custody during the school week and further recommended that mother's section 388 petition be denied.

In a September 4, 2012, status review report, DCFS informed the juvenile court that C.H. continued to receive therapy from Dr. Bissada and appeared to have improved confidence in her "abilities and academic achievement." It further reported that mother continued to test negatively for all substances and had met regularly with DCFS. Mother indicated to the CSW that because she had complied with everything the juvenile court asked her to do, she wanted the case closed. She also wanted the custody arrangement changed to a "one week on, one week off" schedule. The CSW explained that she had not been able to observe mother's interactions with C.H. during the reporting period because mother had custody on weekends when the CSW was not working.

11

The CSW observed father's interactions with C.H. and characterized them as "warm and appropriate." Father continued to provide a "stable and loving home for C.H." Father was satisfied with the current custody schedule, but would accept a change to alternate weekends. Father noted mother continued her efforts to manipulate the custody schedule by, for example, having C.H. call father to ask if she could stay longer at mother's house. DCFS recommended that the juvenile court terminate jurisdiction and enter an order granting father primary custody and mother secondary custody.

In a last minute information submitted for the November 13, 2012, hearing on termination of jurisdiction and the section 388 petition, a CSW reported that the principal at C.H.'s school confirmed that C.H. was continuing to make progress. The principal opined that it would be in C.H.'s best interests not to change the custody arrangement.

At the November 13, 2012, hearing, CSW Amanda Bielonko was called as a witness by mother and testified as follows. Ms. Bielonko recently spoke to the principal at C.H.'s school and was informed that C.H. was "making good progress." One of the reasons Ms. Bielonko recommended that the current custody schedule remain the same was that, under father's care, C.H.'s effort in school had "greatly improved."

Ms. Bielonko was not aware that Dr. Bissada recommended that C.H.'s vision be tested, but she was aware that Dr. Bissada recommended "psycho-educational testing." According to Ms. Bielonko, DCFS could not request that the school perform psycho-educational testing on C.H. as that request needed to be made by C.H.'s parents.

Ms. Bielonko's recommendation that the custody schedule remain the same was based on her observation that, under father's custody, there was "more accountability with regards to school" and "father's home [had] more structure and rules." For example, mother told Ms. Bielonko that "if [C.H.'s] homework [was] too hard, [mother would] write a note to the teacher, asking the teacher to explain it to [C.H.] and excus[e] [C.H.] from doing the homework. Whereas father [and C.H.] report[ed] that he [sat] and did the homework with [C.H.]." Based on her observations, Ms. Bielonko concluded that C.H. did not "have consequences at mother's home." C.H. reported to Ms. Bielonko that "she

12

didn't have any chores, that the maids cleaned for her." Ms. Bielonko observed a lack of discipline on most of her visits to mother's home.

On cross-examination by C.H.'s counsel, Ms. Bielonko confirmed that she had not visited mother's home since March 2012. Ms. Bielonko observed that whenever a court date was approaching, C.H. would ask her "a lot of questions about court and then get kind of worked up. And she [would] sometimes revert back to the statements of 'My dad cheats. He steals. He lies.'" But when father would return to the room, C.H. would calm down quickly and her "interaction [with father] was fine. Normal." Due to C.H.'s reactions to upcoming court hearings, Ms. Bielonko recommended termination of jurisdiction.

Mother called C.H.'s therapist, Angela Bissada, as a witness, and she testified as follows. Dr. Bissada had been C.H.'s therapist since March 2011. She had therapy sessions with C.H. every two weeks. C.H. had expressed to Ms. Bissada her desire to spend more time with mother. C.H. experienced distress because she could not spend as much time as wanted with mother. If the custody scheduled changed, Dr. Bissada would observe and monitor C.H. for any changes in behavior.

Dr. Bissada had seen progress in mother over the last year. But she had not seen a significant improvement in C.H. in the two years she had been providing her therapy. C.H. did, however, seem to be more calm due to Dr. Bissada's work with her in therapy.

Dr. Bissada had spoken with C.H.'s teachers and her social workers, and had formed the opinion that C.H. would benefit from psycho-educational testing. C.H. had not experienced any significant improvement in her grades for over a year. She continued to have well below average scores in basic subjects. C.H.'s teachers and principal recommended that she receive outside intervention at facilities such as Sylvan or Kumon. Dr. Bissada believed it was important for both parents to follow the recommendations that the school was making, and both parents should request the testing and follow the recommendations from the testing. It would concern her if father failed to follow through on recommendations. And the school informed Dr. Bissada that father

13

had not followed through on the five recommendations the school had made concerning C.H.

C.H. told Dr. Bissada that father allowed her to ride in the front seat of the car. He also did not require her to wear a helmet when she went ice skating and did not like the fact that mother made her wear a helmet.

Mother explained to Dr. Bissada her concerns about father's anger issues. Dr. Bissada also personally witnessed behavior by father that gave her concerns about his anger. Father became angry with Dr. Bissada in her waiting room when he was picking C.H. up after a therapy session. The incident involved a "payment issue." Father informed Dr. Bissada that he could not pay her because she had not provided him with paperwork he needed. He then said, "We have to pay more money because of you." Dr. Bissada twice asked father "to stop talking about [the payment] issue and to contact [her] outside the session so [C.H.] didn't hear. And [father became] more and more hostile. [T]hen [father] said he trie[d] to work with [Dr. Bissada] and [she] just [made] it difficult. [T]hen he walked out of the waiting room."

C.H. also told Dr. Bissada about the incident at the mall between father and mother. According to C.H., she was at the mall for dance class and father began yelling at mother and grabbed both her and C.H. by the arm. C.H. ran into Macy's and interacted with a female employee. When father approached, the female employee questioned him and said, "Don't take her like this." Father then grabbed C.H. by the arm and took her out of the store.

In November 2011, when C.H. disclosed that she may have been touched by someone inappropriately, Dr. Bissada discussed with mother how to deal with the issue. Dr. Bissada did not have any problem with the manner in which mother addressed that issue.

Dr. Bissada believed if there was a change in custody and mother had more time with C.H., it would affect C.H. emotionally. C.H. might initially be happy with the change, but Dr. Bissada could not "anticipate what the short-term, long-term effect would

14

be on her emotionally . . . ." Dr. Bissada did not have any reason to believe that C.H. should not spend more time with mother.

On cross-examination by father's counsel, Dr. Bissada stated that she knew C.H.'s school had made five educational recommendations to father, but she could only remember two of them—tutoring at an outside facility like Kumon or Sylvan and working with C.H. on first-grade phonics. It was Dr. Bissada's understanding that C.H. was not receiving any tutoring. Dr. Bissada knew C.H. had achieved "3's and 4's" in effort, but she also "had a 2 as her score all three quarters of third grade and now the first quarter of fourth grade in basic subjects."

On redirect examination, Dr. Bissada explained that C.H. wanted more privacy at father's house because "her bedroom door was left open." Dr. Bissada recommended that C.H. speak to father about her concern and he "helped her to be able to close the door." C.H. also told Dr. Bissada that father "yell[ed] at her when they're doing homework, that he yell[ed] hard and spit on her sometimes, [and] that he [had] told her that it [was] not safe at her mother's house." C.H. talked to Dr. Bissada about "being afraid of her father, of his anger, . . . [and] that he doesn't listen to her. [C.H. was] afraid to talk to father, [and] he show[ed] her court papers."

Mother testified on her own behalf as follows. On the issue of "structure" when C.H. was at mother's home, mother explained that she would "pick [C.H.] up from school. [They] would go home. And [mother would] fix [C.H.] a snack, [would] let her relax for like, a half hour, watch some cartoons. [They] would then go to the dining room table and . . . [C.H.] would start her homework. And when she was done, [they would] put [the homework] back in the backpack by the front door and [then] go on a play date, come home, have dinner and tubby and bedtime and [a] book."

When C.H. was in mother's home, she received tutoring twice a week. Contrary to Ms. Bielonko's testimony that mother never provided her with the name of a specialist who could do educational testing for C.H., mother provided the specialist's name to her on three occasions. It was mother's understanding that from the time C.H. was removed from her until the end of the school year, C.H. had received at least 80 hours of

intervention—two days a week after school for an hour reviewing math and English with a teacher and a small group of students.

Regarding the incident at the mall, Dr. Gibbs had recommended, and father had agreed to, giving mother additional visitation from 3:00 p.m. to 7:00 p.m. on Wednesdays. The incident took place on the first day that additional visitation was to be implemented. Dr. Bissada's description of the incident, as C.H. had explained it to her, was, in mother's view, accurate.

In November 2011, before C.H. was removed from mother, the relationship between father and mother had improved, and C.H. had commented on how happy she was that mother and father were communicating and "getting along." Mother felt "good" about her improved relationship with father, and C.H.'s teacher told mother that C.H. was doing better in school.

Mother just wanted to "co-parent" and "to get along [with father] again." Mother was willing to continue conjoint therapy with Dr. Gibbs. Mother wanted the custody arrangement to return to what it was before C.H. was removed from her.

After hearing from DCFS, the juvenile court stated, "The Court: After hearing everything and reading everything, I feel like we're back to talking about 'family law issues versus risk.' So my tentative would be to get out and allow the original family law order to have—remain in effect. And I'd like to know how you feel about that." C.H.'s counsel responded by agreeing with the juvenile court. The juvenile court then heard argument from father's counsel and ruled as follows: "The Court: That being said, nothing that I've heard has really changed my mind from the evidence in front of me, which is that we've moved from risk to who should have what hours of what day. And that is much better left up to the family law court. [¶] Mother has been testing. She's testing clean. Everybody is in therapy. And the issues of –I mean, there's a reality here. And that is the parents are going to have to work through what kind and how much intervention [C.H.] should have. [¶] How much intervention is too much? How much intervention is not enough? When do you reach the point where pulling a child out of a classroom for intervention is more harmful to her than the intervention itself? Should

16

there be after school tutoring?  And should that be Sylvan or Kumon?  It's just [beyond] the issues that this Court has to deal with.  [¶]  And while I understand that father's arguing that there could be educational risk, the reality is this.  [C.H.] is doing better.  She's still struggling in some stuff.  And the parents are going to have to figure that out.  This is not the worst thing that ever happened in the world.  [¶]  As parents, we do the best we can for our kids.  We try to get them as much assistance as we can, both within our homes and outside of our homes.  And then we accept our children for what they are and who they are.  [¶]  And I still find, frankly, very unfortunate that so much time and energy—I can guarantee you this.  I can guarantee the parents this.  You are doing way more harm to [C.H.] by pulling her apart than the 2's on her report card at her age.  [¶]  Jurisdiction is terminated.  The [2010] family law order that was in effect out of family law court remains in full force and effect."  Thus, C.H. would live primarily with mother.

## DISCUSSION

### A.    Standard of Review

Custody determinations, such as the one at issue, are "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.  (*In re Michael B*. (1992) 8 Cal.App.4th 1698 [11 Cal.Rptr.2d 290]; *In re Corey* (1964) 230 Cal.App.2d 813, 832 [41 Cal.Rptr. 379].)  As one court has stated, when a court has made a custody determination in a dependency proceeding, '"a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'"  (*In re Geoffrey G*. (1979) 98 Cal.App.3d 412, 421 [159 Cal.Rptr. 460]; see *In re Mark V*. (1986) 177 Cal.App.3d 754, 759 [225 Cal.Rptr. 460] [accord]; see also *Department of Parks & Recreation v*. *State Personnel Bd*. (1991) 233 Cal.App.3d 813, 831 [284 Cal.Rptr. 839].)  And we have recently warned:  'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the

17

facts, the reviewing court has no authority to substitute its decision for that of the trial court."' (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272 [279 Cal.Rptr. 576, 807 P.2d 418], quoting *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339].)" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

### B.      Analysis

Father contends that because the family's circumstances had changed substantially since the entry of the family law custody order in 2010, it was an abuse of discretion to, in effect, reinstate that order. According to father, unlike the family law court, the juvenile court here was required to consider C.H.'s best interests in fashioning an exit custody order. As father views the evidence, including the evidence of C.H.'s academic improvement under father's care, C.H.'s best interests would have been better served by the existing custody schedule under which C.H. was primarily with father.

In *In re Jennifer R.* (1993) 14 Cal.App.4th 704, the court explained the distinction between family law courts and juvenile dependency courts as to custody issues. "Although both the family court and the juvenile court focus on the best interests of the child significant differences exist. In juvenile dependency proceedings the child is involved in the court proceedings because he or she has been abused or neglected. Custody orders are not made until the child has been declared a dependent of the court and in many cases . . . , the child has been removed from the parents upon clear and convincing evidence of danger. The issue of the parents' ability to protect and care for the child is the central issue. The presumption of parental fitness that underlies custody law in the family court just does not apply to dependency cases. Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*Id.* at p. 712.)

In this case, it is undisputed that the issues that gave rise to the juvenile court's jurisdiction—the parents' ongoing emotional abuse of C.H. and mother's prescription drug use—had been addressed adequately by the time of the hearing at which the juvenile

court issued its exit order regarding custody and, therefore, that it was appropriate to terminate jurisdiction. Nevertheless, father argues that the independent risk to C.H.'s academic performance posed by a joint custody arrangement under which C.H. would spend more time with mother required the juvenile court to follow DCFS's recommendation concerning C.H.'s best interests and order that father continue to have primary custody of C.H. during the week.

Contrary to father's characterization of the evidence, the issue of whether C.H.'s academic performance improved substantially under father's primary custody was disputed. Although the CSW and C.H.'s school principal agreed with father that C.H.'s performance had improved during the period that he had primary custody, mother and the therapist testified that C.H.'s performance had not substantially improved or, to the extent it had, it was due to factors, such as intervention, that were unrelated to father's custody.

Under the governing abuse of discretion standard discussed above, when two or more reasonable inferences can be deduced from the facts, we have no power to substitute our decision for that of the trial court. Here, the trial court found that C.H.'s interest in academic improvement would be best served by a joint custody arrangement under which C.H. spent more time with mother, but also received the recommended outside assistance with her studies based on the evidence from the therapist, school officials, and mother that such outside assistance would best serve C.H.'s interest in academic improvement. In light of that evidence, and regardless of father's evidence to the contrary, it was not unreasonable for the juvenile court to conclude that such a joint custody arrangement would strike the proper balance between C.H.'s legitimate interest in spending more time with mother and her interest in better academic achievement at school. Because that determination by the juvenile court cannot be said to exceed the bounds of reason, there was no abuse of discretion and, therefore, we must affirm the exit custody order.

## C.    Motion to Dismiss

Following briefing, mother filed a motion to dismiss father's appeal as moot.  She based her motion on an August 20, 2013, minute order which reflects that, on that date, the juvenile court temporarily detained C.H. from mother's custody and placed her in father's sole custody pending further hearing.  That minute order, however, does not reflect the reason for the temporary change in custody.  According to mother, because the exit custody order from which father appeals is no longer in effect, there is no effective relief that this court can provide father on appeal.  We disagree.

At best, the August 20, 2013, minute order establishes that custody of C.H. has been *temporarily* changed.  The order does not suggest, much less establish, that the order from which father appeals has been permanently abrogated or can never be reinstated.  As a result, because mother has failed to carry her burden of showing that father's appeal is moot, her motion to dismiss is denied.

In ruling that father's appeal is not moot, we affirm our jurisdiction to resolve the issues raised by the appeal concerning the December 2012, exit custody order, but make no determination of or comment on the issues that gave rise to the August 20, 2013, minute order upon which mother's motion to dismiss is based, which issues shall be resolved by the juvenile court.

**DISPOSITION**

The custody order from which father appeals is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.